**CYBOR CORPORATION,**
Plaintiff–Appellant,

v.

**FAS TECHNOLOGIES, INC., and Fastar Ltd., Defendants–Cross Appellants.**

Nos. 96–1286, 96–1287.

United States Court of Appeals, Federal Circuit.

March 25, 1998.

Tod L. Gamlen, Baker & McKenzie, of Palo Alto, CA, argued for plaintiff–appellant. With him on brief was David I. Roche, of Chicago, IL.

Douglas A. Cawley, Hughes & Luce, L.L.P., of Dallas, TX, argued for defendants–cross appellants. With him on brief was Aubrey Nick Pittman.

Before MAYER, Chief Judge,* RICH, NEWMAN, Circuit Judges, ARCHER, Senior Circuit Judge,** MICHEL, PLAGER, LOURIE, CLEVENGER, RADER, SCHALL, BRYSON, and GAJARSA, Circuit Judges.

Opinion for the court filed by Senior Circuit Judge ARCHER, in which Circuit Judges RICH, MICHEL, PLAGER, LOURIE, CLEVENGER, SCHALL, BRYSON, and GAJARSA join; Circuit Judge RADER joins as to part IV. Concurring opinions filed by Circuit Judges PLAGER and BRYSON. Opinions

---

* Chief Judge Haldane Robert Mayer assumed the position of Chief Judge on December 25, 1997.

** Senior Circuit Judge Glenn L. Archer, Jr. vacated the position of Chief Judge on December 24, 1997.

concurring in the judgment filed by Chief Judge MAYER, which Circuit Judge NEWMAN joins, and Circuit Judge RADER. Additional views filed by Circuit Judge NEWMAN, which Chief Judge MAYER joins.

ARCHER, Senior Circuit Judge.

Cybor Corporation (Cybor) appeals from the judgment of the United States District Court for the Northern District of California, 93–CV–20712 (Oct. 31, 1995), that Cybor pump, Model 5226, infringes the claims of U.S. Patent No. 5,167,837 (the '837 patent), currently owned by FAStar, Ltd. and exclusively licensed to FAS Technologies, Inc. (collectively FAS). FAS cross-appeals the judgment as to the damages calculation, the denial of enhanced damages, and the refusal to declare the case exceptional and to award attorney fees. A panel heard oral argument on January 29, 1997. Before its opinion issued, however, this court *sua sponte* on September 5, 1997 ordered that this case be decided in banc.

We affirm the district court's judgment in its entirety. In so doing, we conclude that the Supreme Court's unanimous affirmance in *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) (*Markman II* ), of our in banc judgment in that case fully supports our conclusion that claim construction, as a purely legal issue, is subject to *de novo* review on appeal. *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979, 34 USPQ2d 1321, 1329 (Fed.Cir.1995) (in banc) (*Markman I* ).

---

1. The actual patent claim is not written in paragraph form as shown here; we have added the breaks for ease of reference to the claim's limita-

## BACKGROUND

The '837 patent discloses a device and method for accurately dispensing industrial liquids. The primary use of the patented inventions is to dispense small volumes of liquid onto semiconductor wafers. Claim 1 is representative and reads: [1]

1. In a device for filtering and dispensing fluid in a precisely controlled manner, the combination of:

first pumping means;

second pumping means in fluid communication with said first pumping means; and

filtering means between said first and second pumping means, whereby said first pumping means pumps the fluid through said filtering means to said second pumping means;

in which each of said first and second pumping means includes surfaces that contact the fluid, said surfaces being of materials that are non-contaminating to industrial fluids which are viscous and/or high purity and/or sensitive to molecular shear; and

comprising means to enable said second pumping means to collect and/or dispense the fluid, or both, at rates or during periods of operation, or both, which are independent of rates or periods of operation, or both, respectively, of said first pumping means.

Figure 2 of the patent illustrates a preferred embodiment of the invention:

tions.

**Fig. 2.**

In the preferred embodiment, the fluid to be filtered enters the system through tubing 14 and travels through the ball valve 24 to the first pumping means 30 via tubing 41. The pumping means 30 then pumps the liquid back through the ball valve 24, which rotates to close tubing 14 and open tubing 102. The liquid then flows to the filter means 100 in which it is filtered. The filtered liquid (filtrate) then flows through tubing 116 and into the second pumping means 120. The filtrate can then be immediately dispensed, accumulated in the upper compartment 131 of the pumping means 120, or simultaneously accumulated and dispensed. The filtrate is dispensed in precise measurements by the second pumping means 120 through tubing 16 at rates and during periods of operation that are independent of the first pumping means 30.

The dual stage pump manufactured by Cybor is used for the same purpose as that of the patented invention—application of liquid in precise, small volumes onto semiconductor wafers. It is illustrated below:

In the accused device, pump 1 draws the liquid from a source bottle through a feed line and through a three-way solenoid valve. The solenoid valve then closes the passage to the source bottle and opens the line to the filter, allowing pump 1 to deliver the liquid to the filter. After the liquid passes through the filter, the filtrate flows to a reservoir external to pump 2, where it accumulates until dispensed by pump 2. It is uncontested that the external reservoir, coupled with the second pump, allows the system to accumulate, dispense, or simultaneously accumulate and dispense filtrate. The filtrate leaves the reservoir through another three-way solenoid connector, or valve, and enters the second pump. The solenoid valve then closes the passage to the reservoir and opens the dispense port, through which the second pump dispenses the filtrate back through the solenoid valve and on through the dispensing port and line.

On September 23, 1993, Cybor sued FAS for a declaratory judgment of non-infringement, invalidity, and unenforceability of the '837 patent. FAS counterclaimed[2] for infringement of all twenty claims and sought damages and injunctive relief. The case proceeded to trial, and the jury found by special

verdict that the claims were not invalid, that Cybor literally infringed all the claims except 11, 12, and 16, and that these three remaining claims were infringed under the doctrine of equivalents. The jury determined the infringement to be willful for all claims except claim 16.

After the jury rendered its liability verdict, the district court denied Cybor's renewed motion for Judgment as a Matter of Law (JMOL) that it did not infringe the '837 patent, and also denied FAS's motion for an exceptional case award of attorney fees pursuant to 35 U.S.C. § 285 (1994). Prior to the entry of final judgment, however, this court decided *Markman I*, which held that claim construction is a matter of law to be determined exclusively by the judge. Cybor then filed a motion for reconsideration of its JMOL motion in light of that decision, but the district court denied reconsideration. After further proceedings on damages, the district court on October 11, 1995, filed its Findings of Fact and Conclusions of Law permanently enjoining Cybor from making, using, or selling its system, awarding FAS $130,912 in damages, and denying FAS's motion for enhanced damages under 35 U.S.C. § 284 (1994). The district court entered its

2. Both FAStar and FAS Technologies filed an answer to Cybor's complaint. FAStar alone originally filed the counterclaim, but FAS Technologies was joined as a counterclaimant after the jury trial on liability was completed.

final judgment on October 31, 1995, and these appeals followed.

## DISCUSSION

### I.

■ A. This court reviews a denial of a motion for JMOL *de novo* by reapplying the JMOL standard. *See Read Corp. v. Portec, Inc.*, 970 F.2d 816, 821, 23 USPQ2d 1426, 1431 (Fed.Cir.1992). Under this standard, we can reverse a denial of a motion for JMOL only if the jury's factual findings are not supported by substantial evidence or if the legal conclusions implied from the jury's verdict cannot in law be supported by those findings. *See Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1547–48, 31 USPQ2d 1746, 1751 (Fed.Cir.1994).

■ An infringement analysis involves two steps. First, the court determines the scope and meaning of the patent claims asserted, *see Markman II*, 517 U.S. at 371–73, 116 S.Ct. at 1387–88, and then the properly construed claims are compared to the allegedly infringing device, *see Read Corp.*, 970 F.2d at 821, 23 USPQ2d at 1431. Although the law is clear that the judge, and not the jury, is to construe the claims, this case presents the issue of the proper role of this court in reviewing the district court's claim construction.

In *Markman I*, we held that, because claim construction is purely a matter of law, this court reviews the district court's claim construction *de novo* on appeal. *See Markman I*, 52 F.3d at 979, 981, 34 USPQ2d at 1329, 1331. In reaching this conclusion, we recognized that

[t]hrough this process of construing claims by, among other things, using certain extrinsic evidence that the court finds helpful and rejecting other evidence as unhelpful, and resolving disputes *en route* to pronouncing the meaning of claim language as a matter of law based on the patent documents themselves, the court is *not* crediting certain evidence over other evidence or making factual evidentiary findings. Rather, the court is looking to the extrinsic evidence to assist in its construction of the written document, a task it is required to perform. The district court's claim construction, enlightened by such extrinsic evidence as may be helpful, is still based upon the patent and prosecution history. It is therefore still construction, and is a matter of law subject to *de novo* review.

*Id.* at 981, 52 F.3d 967, 34 USPQ2d at 1331 (emphasis in original and footnote omitted).

After the Supreme Court's decision in *Markman II*, panels of this court have generally followed the review standard of *Markman I*. *See Serrano v. Telular Corp.*, 111 F.3d 1578, 42 USPQ2d 1538 (Fed.Cir.1997); *Alpex Computer Corp. v. Nintendo Co.*, 102 F.3d 1214, 40 USPQ2d 1667 (Fed.Cir.1996); *Insituform Techs., Inc. v. Cat Contracting, Inc.*, 99 F.3d 1098, 40 USPQ2d 1602 (Fed.Cir. 1996); *General Am. Transp. v. Cryo–Trans, Inc.*, 93 F.3d 766, 39 USPQ2d 1801 (Fed.Cir. 1996). In some cases, however, a clearly erroneous standard has been applied to findings considered to be factual in nature that are incident to the judge's construction of patent claims. *See Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1555–56, 42 USPQ2d 1737, 1742 (Fed.Cir. 1997); *Serrano*, 111 F.3d at 1586, 42 USPQ2d at 1544, (Mayer, J., concurring); *Wiener v. NEC Elecs. Inc.*, 102 F.3d 534, 539, 41 USPQ2d 1023, 1026 (Fed.Cir.1996); *Metaullics Sys. Co. v. Cooper*, 100 F.3d 938, 939, 40 USPQ2d 1798, 1799 (Fed.Cir.1996).[3] We ordered that this case be decided in banc

---

**3.** It is difficult to reconcile the language and reasoning in this court's recent opinion in *Fromson v. Anitec Printing Plates, Inc.*, 132 F.3d 1437, 45 USPQ2d 1269 (Fed.Cir.1997), with *Markman I*, although the opinion purports to do so. As we stated in *Markman I*, "extraneous evidence [such as the expert testimony in *Fromson*] is to be used for the court's understanding of the patent" and in doing so, the court "is *not* crediting certain evidence over other evidence or making factual evidentiary findings." *Markman I*, 52 F.3d at 981, 34 USPQ2d at 1331 (emphasis in original). Rather, we considered such evidence to be an aid to the court in coming to a correct conclusion as to the true meaning of the language employed in

the patent. *See id.* at 980, 52 F.3d 967, 34 USPQ2d at 1330. The Supreme Court in effect confirmed this when it stated that the credibility determinations among experts "will be subsumed within the necessarily sophisticated analysis of the whole document." *Markman II*, 517 U.S. at 389, 116 S.Ct. at 1395. In *Fromson*, the district court "relied primarily on the '754 specification which describes Fromson's first anodization step as producing [a] porous oxide" barrier. *Fromson*, 132 F.3d at 1442, 45 USPQ2d at 1272. Although the extrinsic evidence—expert testimony, prior art, and scientific tests—confirmed the district court's claim construction, it was direct-

to resolve this conflict, and we conclude that the *de novo* standard of review as stated in *Markman I* remains good law.

■ B. The Supreme Court framed the question before it in *Markman II* in the alternative: "whether the interpretation of a so-called patent claim ... *is a matter of law* reserved entirely for the court, or subject to a Seventh Amendment guarantee that a jury will determine the meaning of any disputed term of art about which expert testimony is offered." *Markman II*, 517 U.S. at 372, 116 S.Ct. at 1387 (emphasis added). When it answered that question by stating that "[w]e hold that the construction of a patent, including terms of art within its claim, is exclusively within the province of the court," *id.*, the Court held that the totality of claim construction is a legal question to be decided by the judge. Nothing in the Supreme Court's opinion supports the view that the Court endorsed a silent, third option—that claim construction may involve subsidiary or underlying questions of fact.[4] To the contrary, the Court expressly stated that "treating interpretive issues as *purely legal* will promote (though not guarantee) intrajurisdictional certainty through the application of *stare decisis* on those questions not yet subject to interjurisdictional uniformity under the authority of the single appeals court." *Id.* at 391, 116 S.Ct. at 1396 (emphasis added); *see also id.* at 387, 116 S.Ct. at 1394 (" 'Questions of construction are questions of law for the judge, not questions of fact for the jury' " (quoting A. Walker, *Patent Laws* § 75 at 173 (3d ed. 1895))). Indeed, the sentence demonstrates that the Supreme Court endorsed this court's role in providing national uniformity to the construction of a patent claim, a role that would be impeded if we were bound to give deference to a trial judge's asserted factual determinations incident to claim construction.

The opinions in some of our cases suggesting that there should be deference to what are asserted to be factual underpinnings of claim construction assert support from the language in *Markman II* stating that "construing a term of art after receipt of evidence" is a "mongrel practice," *id.* at 378, 116 S.Ct. at 1390, and that the issue may " 'fall[ ] somewhere between a pristine legal standard and a simple historical fact,' " *id.* at 388, 116 S.Ct. at 1395 (quoting *Miller v. Fenton*, 474 U.S. 104, 114, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985)). These characterizations, however, are only prefatory comments demonstrating the Supreme Court's recognition that the determination of whether patent claim construction is a question of law or fact is not simple or clear cut; they do not support the view that the Court held that while construction is a legal question for the judge, there may also be underlying fact questions. To the contrary, the court noted that

> when an issue "falls somewhere between a pristine legal standard and a simple historical fact, the *fact/law distinction* at times has turned on a determination that, as a matter of sound administration of justice, one judicial actor is better positioned than another to decide the issue in question."

*Id.* (quoting *Miller v. Fenton*, 474 U.S. 104, 114, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985)) (emphasis added). Thus, the Supreme Court was addressing under which category, fact or law, claim construction should fall and not whether it should be classified as having two components, fact and law.

Further supporting the conclusion that claim construction is a pure issue of law is the Supreme Court's analysis of the role of expert testimony in claim construction. Generally, the Court has recognized the important role played by juries in evaluating the credibility of a witness, a key consideration in determining the appropriate judicial actor to decide an issue. *See Miller*, 474 U.S. at 114, 106 S.Ct. at 451–52. In the context of claim construction, however, the Court reasoned that, while credibility determinations theoretically could play a role in claim con-

---

ed primarily to whether Anitec's thin, nonporous oxide layer infringed the claims. To this extent, the holding in *Fromson* affirming the district court's claim interpretation follows *Markman I*. *See Bell & Howell Document Management v. Altek Sys.*, 132 F.3d 701, 705–06, 45 USPQ2d 1033, 1038 (Fed.Cir.1997); *Vitronics Corp. v. Concep-*

*tronic, Inc.*, 90 F.3d 1576, 1584, 39 USPQ2d 1573, 1578 (Fed.Cir.1996).

4. If this were so, surely the Supreme Court would have discussed whether subsidiary or underlying fact questions should be decided by the judge or the jury.

struction, the chance of such an occurrence is "doubtful" and that "any credibility determinations will be subsumed within the necessarily sophisticated analysis of the whole document, required by the standard construction rule that a term can be defined only in a way that comports with the instrument as a whole." *Markman II*, 517 U.S. at 389, 116 S.Ct. at 1395; *see also id.* at 388, 116 S.Ct. at 1394–95 (" '[T]he testimony of witnesses may be received.... But in the actual interpretation of the patent the court proceeds upon its own responsibility, as an arbiter of the law, giving to the patent its true and final character and force.' " (quoting 2 W. Robinson, *Law of Patents* § 732 at 481–83 (1890))). Such a conclusion is consistent with the view that claim construction, as a form of "document construction," *id.* at 388–90, 116 S.Ct. at 1395, is solely a question of law subject to *de novo* review, as noted above. *See Markman I*, 52 F.3d at 981, 34 USPQ2d at 1331.

Moreover, while the Supreme Court's opinion conclusively and repeatedly states that claim construction is purely legal, another view of the Court's decision also demonstrates that our standard of review remains intact. The Court's primary concern in *Markman II* was the Seventh Amendment issue of whether a right to a jury trial on claim construction inured to a party due to any potential factual issues involved. Because the Court did not discuss the appellate standard of review, *Markman II* can be read as addressing solely the respective roles of the judge and jury at the trial level and not the relationship between the district courts and this court. Although our conclusion in *Markman I* that claim construction is a matter of law was affirmed in all respects, even this narrower view of *Markman II* leaves *Markman I* as the controlling authority regarding our standard of review.

Thus, we conclude that the standard of review in *Markman I*, as discussed above, was not changed by the Supreme Court's decision in *Markman II*, and we therefore reaffirm that, as a purely legal question, we review claim construction *de novo* on appeal

including any allegedly fact-based questions relating to claim construction. Accordingly, we today disavow any language in previous opinions of this court that holds, purports to hold, states, or suggests anything to the contrary, *see, e.g., Fromson*, 132 F.3d at 1444, 45 USPQ2d at 1274 ("The district court's findings of scientific/technological fact were material to the issue of construction of the term 'anodizing.' "); *Eastman Kodak*, 114 F.3d at 1555–56, 42 USPQ2d at 1742 (affirming district court's claim construction "recognizing both the trial court's 'trained ability to evaluate [expert] testimony in relation to the overall structure of the patent' and the trial court's 'better position to ascertain whether an expert's proposed definition fully comports with the specification and claims ....' " (quoting *Markman II*, 517 U.S. at 388–90, 116 S.Ct. at 1394–95)); *Wiener*, 102 F.3d at 539, 41 USPQ2d at 1026 (citing *Markman II* as controlling our standard of review and parenthetically quoting language from *Markman II* that claim construction " 'falls somewhere between a pristine legal standard and a simple historical fact.' "); *Metaullics*, 100 F.3d at 939, 40 USPQ2d at 1799 ("[B]ecause claim construction is a mixed question of law and fact, we may be required to defer to a trial court's factual findings. Where a district court makes findings of fact as part of claim construction, we may not set them aside absent clear error." (citations omitted)).

## II.

Cybor argues in this appeal that the district court improperly construed the two means-plus-function limitations in the relevant claims of the '837 patent—the "second pumping means" and the "means to enable" the second pumping means to accumulate liquid, dispense liquid, or both. Cybor also challenges the district court's construction of the limitation requiring that the fluid flow "to a second pumping means." All of these arguments turn on the question of whether the district court erred in refusing to limit the scope of the claims based on statements made to the examiner during prosecution.[5]

5. Because Cybor's claim construction arguments relate to the narrowing of claim scope required by prosecution history, we need not consider whether equivalence under § 112, ¶ 6 is a question of law or fact. *See Markman I*, 52 F.3d at

977 n. 8, 34 USPQ2d at 1327 n. 8. Here, the question of equivalence was given to the jury and Cybor does not challenge the equivalence of its accused device if prosecution history does not narrow the scope of the claims as Cybor argues.

In particular, Cybor contends that the prosecution history does not allow the claimed "second pumping means" to cover any reservoir for accumulating fluid that is external to the second pump. Because Cybor's reservoir is external, Cybor argues that its second pump does not meet the second pumping means limitation. Its second pump alone, without regard to the external reservoir, is not able to satisfy the functional limitation of enabling the second pumping means to "accumulate liquid, dispense liquid, or both." With an intervening external reservoir, Cybor also argues that the fluid does not flow "to" a second pumping means from the filter means as required by the claims.

■■■ A. Under § 112, ¶ 6, an accused device with structure not identical to the structure described in the patent will literally infringe the patent if the device performs the identical function required by the claim with a structure equivalent to that described in the patent. See Micro Chem., Inc. v. Great Plains Chem. Co., 103 F.3d 1538, 1547, 41 USPQ2d 1238, 1245–46 (Fed.Cir.1997). Prosecution history is relevant to the construction of a claim written in means-plus-function form. See United States v. Telectronics, Inc., 857 F.2d 778, 782, 8 USPQ2d 1217, 1220 (Fed.Cir.1988); Rite–Hite Corp. v. Kelley Co., 819 F.2d 1120, 1123, 2 USPQ2d 1915, 1917 (Fed.Cir.1987). Indeed, "just as prosecution history estoppel may act to estop an equivalence argument under the doctrine of equivalents, positions taken before the PTO may bar an inconsistent position on claim construction under § 112, ¶ 6." Alpex, 102 F.3d at 1221, 40 USPQ2d at 1673. Clear assertions made in support of patentability thus may affect the range of equivalents under § 112, ¶ 6. Cf. American Permahedge, Inc. v. Barcana, Inc., 105 F.3d 1441, 1446, 41 USPQ2d 1614, 1618 (Fed.Cir.1997); Athletic Alternatives, Inc. v. Prince Mfg., Inc., 73 F.3d 1573, 1582, 37 USPQ2d 1365, 1373 (Fed.Cir.1996). The relevant inquiry is whether a competitor would reasonably believe that the applicant had surrendered the relevant subject matter. See Insituform Techs., Inc., v. Cat Contracting, Inc., 99 F.3d 1098, 1107–08, 40 USPQ2d 1602, 1608 (Fed. Cir.1996).

■■ Cybor relies on two responses by the inventors to the examiner's obviousness rejection of the claims for its position that a pump structure with any external reservoir was given up during prosecution. In each instance, the examiner had cited Storkebaum et al., U.S. Patent No. 4,749,476 (Storkebaum). Storkebaum's container not only collects permeate; it also vents or discharges the fluid. The container feeds a conveying pump that powers the flow of a big circulation loop. The design of Storkebaum is not for the controlled dispensing of fluid. In the first response, the inventors argued that "Storkebaum specifically provides a separate container 12 for collecting permeate. Obviously, Storkebaum does not teach the collection of fluid in a second pumping means." (Emphasis added). In response to a later rejection, the inventors argued that "Storkebaum discloses a permeate collecting container 12 that is separate from the conveying pump 13. Nothing in Storkebaum discloses or makes obvious the claimed invention, nor the precise or flexible control provided by the second pump means of Claim 1." (Emphasis in original). From these statements, Cybor contends that FAS is precluded from asserting that a pump device with an external reservoir is a structural equivalent under § 112, ¶ 6 to its patented device and that the district court, as a matter of law, should not have permitted the jury to consider its external reservoir in determining whether the differences between Cybor's second pump and the '837 patent's second pumping means were insubstantial.

FAS responds that the district court made all of the required determinations regarding claim construction and, in doing so, fully considered the prosecution history at issue. It then submitted the construed claims to the jury for its determination of infringement.[6]

One concurring opinion also recognizes that Cybor's claim construction arguments relate solely to whether the prosecution history requires the exclusion of the external "reservoir structures like Cybor's from consideration as an equivalent under § 112(6)." See Opinion Concurring in the Judgment of Chief Judge Mayer, infra, at 1469.

6. Cybor contends that the jury was not adequately instructed on the meaning of the claims. We note, however, that this case was tried before Markman I and that, while a fuller instruction to the jury on the meaning of the claim might be desirable, the instructions were not erroneous. Moreover, the district court's denial of the motion for reconsideration approved the additional,

We are not convinced that the district court erred in its claim construction or in denying Cybor's motion for JMOL. The district court construed several limitations, or disputed language, in the claims. With respect to the second pumping means limitation, the jury was instructed that it "refers to a structure identical to the structure disclosed in the specification of the patent, or the equivalent to that structure, which performs the function of fluid accumulator/dispense pump." With this instruction, the district court did not narrow the scope of the claim language to exclude a pump with any external reservoir as urged by Cybor. Instead, the jury was instructed to determine whether Cybor's device, with its pump and attached reservoir, was structurally equivalent and whether it had the same functionality as the second pumping means of the '837 patent.[7]

From our reading of the patent document and the prosecution history, we agree with the district court's construction and jury instructions. While it is quite clear the inventors limited the scope of their claims to overcome the Storkebaum reference, they emphasized the separateness of Storkebaum's container, both physically and functionally, as compared to the claimed invention. For example, the statements noted that Storkebaum "provides a separate container" and that it has a container "that is separate from the conveying pump." The specification of the '837 patent elaborates on the structure of the second pumping means and its "means to enable" as having tubing connecting the second pumping means to the second incremental pump advancement means, see col. 5, lines 49–52. While in the preferred embodiment, the '837 patent disclosed a storage reservoir inside the pump, it is not disputed that the claimed second pumping means encompasses both a pump and a reservoir having connecting tubing.

The Storkebaum device differs materially from the patented invention. Storkebaum discloses a filtering system to separate pressure sensitive substances from a liquid suspension. It has a conveying pump that operates to circulate the fluid through a large closed circuit loop. It also has a separate reservoir to collect and regulate the amount of permeate in the closed circuit. Thus, the container in the Storkebaum apparatus has the separate function and capability of venting or discharging excessive liquid in order to prevent undesirable build up of liquids in the system.

In view of the significant differences between the cited Storkebaum patent and the claimed invention, including the structurally separate container and independent function of discharging excess fluid in Storkebaum, the prosecution statements cannot properly be interpreted as precluding coverage of every type of external reservoir. In particular, we agree with the district court's apparent conclusion that these statements only disclaimed a physically unattached reservoir which has independent functionality. They did not disclaim a reservoir which is physically connected to the pump and which only collects fluid to be dispensed by that pump. Thus, we conclude that the district court did not err in instructing the jury in a manner which would permit it to consider the equivalency of Cybor's pump and reservoir to the claimed second pumping means. Further, it did not err in denying Cybor's JMOL motion on this issue.

■ B. Cybor further challenges the district court's claim interpretation regarding the claim limitation that the first pumping means pumps the fluid through the filtering means "to" the second pumping means. Cybor contends that this language requires that the liquid flow directly from the filtering means to the second pumping means without

presumptive construction of the claims by the jury.

7. One concurring opinion suggests that this court cannot affirm the decision below under a *de novo* standard of review, asserting that the basis for the jury's decision is unclear. We disagree that the jury could have had in mind the several variations posited by the concurrence. It is pat-

ently impossible for Cybor's pump, without a reservoir, to perform the functions called for by the patent. Thus, the jury had to consider the combination of Cybor's pump and the external, attached reservoir as being a "pumping means" equivalent to the structure disclosed in the patent, which consisted of a pump with an internal reservoir.

passing through any additional components. Because the fluid in Cybor's device flows through the external reservoir, which Cybor views as a component separate from the claimed second pumping means, Cybor argues that it does not infringe.

We reject Cybor's arguments because, as previously discussed, the external reservoir in the Cybor's device was apparently held by the jury to be a part of its "second pumping means" and not a separate component.

We also agree with the district court's interpretation that the "to" limitation requires only that the liquid move from the filter "in a pathway with a destination of the second pumping means" and does not preclude the fluid from passing through intervening components. *Cf. Webster's II New Riverside Univ. Dictionary* 1214 (1984) (defining "to" as "[i]n a direction toward"); *see Vitronics,* 90 F.3d at 1584 n. 6, 39 USPQ2d at 1578 n. 3 (noting that, although technically extrinsic evidence, the court is free to consult dictionaries at any time to help determine the meaning of claim terms). Nothing in the specification or prosecution history suggests the interpretation put forth by Cybor.

Applying the above interpretations, substantial evidence supports the jury's verdict that Cybor's device literally infringes the claims of the '837 patent. Accordingly, we conclude that the district court properly denied Cybor's motion for JMOL as to literal infringement.

## III.

■ Cybor also challenges the denial of its JMOL motion on the ground that its device does not infringe the '837 patent under the doctrine of equivalents. The jury determined that claims 11, 12, and 16 are not literally infringed but are infringed under the doctrine of equivalents. Claims 10, 11, and 12 read:

10. A method for filtering and dispensing industrial fluids which are viscous and/or high purity and/or shear sensitive, comprising the steps of: pumping the fluid through filtering means by first pumping means *to second pumping means;* accumulating the fluid in *second pumping means* at rates or during periods of operation, or both, independent of the rates or periods of operation, or both, respectively, of said first pumping means; and dispensing the fluid by operating said second pumping means.

11. The method of claim 10 wherein said accumulating step is achieved by operating said second pumping means on an intake stroke at the same rate at which said first pumping means is pumping said fluid through said filter, so that the fluid which has been filtered is accumulated in said second pumping means without being dispensed from said second pumping means.

12. The method of claim 10 wherein said accumulating step includes operating said second pumping means to draw said filtered fluid at a rate slightly greater than the rate at which said filtered fluid is being pumped by said first pumping means, such that there is a slight drawback of said fluid from a dispensing means of said second pumping means.

(Emphasis added). Claim 16 is a combination claim that reads:

16. In a device for filtering and dispensing high-purity and/or viscous and/or shear-sensitive fluid, the combination of: a first diaphragm-type pump; filtering means connected to receive the fluid from said first diaphragm-type pump; and a second diaphragm-type pump connected to receive the fluid from said filtering means, in which each of said first and second diaphragm-type pumps includes surfaces that contact the fluid, said surfaces being of materials that are non-contaminating to industrial fluids which are viscous and/or high purity and/or sensitive to molecular shear; and comprising *means to enable said second diaphragm-type pump to collect and/or dispense the fluid, or both, at rates or during periods of operation, or both, which are independent of rates or periods of operation, or both, respectively of said first diaphragm-type pump.*

(Emphasis added).

■ An accused device that does not literally infringe a claim may still infringe under the doctrine of equivalents if each limitation of the claim is met in the accused device either literally or equivalently. *See Warner–Jenkinson Co. v. Hilton Davis*

*Chem. Co.,* —— U.S. ——, ——, 117 S.Ct. 1040, 1054, 137 L.Ed.2d 146 (1997); *see also Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 935, 4 USPQ2d 1737, 1740 (Fed.Cir.1987) (in banc). Prosecution history estoppel provides a legal limitation on the application of the doctrine of equivalents by excluding from the range of equivalents subject matter surrendered during prosecution of the application for the patent. *See Warner–Jenkinson,* —— U.S. at ——, 117 S.Ct. at 1049. The estoppel may arise from matter surrendered as a result of amendments to overcome patentability rejections, *see id.,* or as a result of argument to secure allowance of a claim, *see Wang Lab., Inc. v. Mitsubishi Elecs., Inc.,* 103 F.3d 1571, 1578, 41 USPQ2d 1263, 1269 (Fed.Cir.1997). Prosecution history estoppel is a legal question subject to *de novo* review on appeal. *See Insituform,* 99 F.3d at 1107, 40 USPQ2d at 1609.

Cybor argues that there is no infringement under the doctrine of equivalents because prosecution history estoppel precludes FAS both from claiming an external reservoir and a pump as an equivalent to the second pumping means of claims 11 and 12 and from claiming an external, attached reservoir as the equivalent to the means to enable the second diaphragm-type pump in claim 16 to accumulate, dispense, or both accumulate and dispense the liquid. Additionally, Cybor urges that, because the accused device has an intervening reservoir, the limitation requiring the filtrate to flow to the second pumping means in claims 11 and 12 would not equivalently be met.

These arguments are unpersuasive for the same reasons that we rejected them under our § 112, ¶ 6 claim construction and literal infringement analysis. The inventor's statements to the PTO regarding the Storkebaum reference, given the marked differences between the reference and the patented and accused devices, do not show the deliberate, unequivocal surrender of all external reservoirs. *See Read Corp. v. Portec, Inc.,* 970 F.2d 816, 824, 23 USPQ2d 1426, 1433 (Fed. Cir.1992) ("Every statement made by a patentee during a prosecution to distinguish a prior art reference does not create a *separate* estoppel. Arguments must be viewed in context."). Because Cybor's pump and reservoir with connecting tubing do not fall within the range of subject matter relinquished, prosecution history does not preclude infringement under the doctrine of equivalents. Accordingly, the district court's denial of Cybor's motion for JMOL with respect to infringement under the doctrine of equivalents was not error.

## IV.

On cross-appeal, FAS argues that, in light of the jury's determination that Cybor's infringement was willful, the district court erred both by refusing to find this case exceptional, and thus denying attorney fees under 35 U.S.C. § 285 (1994), and by denying enhanced damages under 35 U.S.C. § 284 (1994). FAS also challenges the district court's approach in calculating damages.

**■■■** A. The determination of whether a case is exceptional and, thus, eligible for an award of attorney fees under § 285 is a two-step process. *See Reactive Metals and Alloys Corp. v. ESM, Inc.,* 769 F.2d 1578, 1582, 226 USPQ 821, 824 (Fed.Cir.1985). First, the district court must determine whether a case is exceptional, a factual determination reviewed for clear error. *See Baldwin Hardware Corp. v. Franksu Enter. Corp.,* 78 F.3d 550, 563, 37 USPQ2d 1829, 1838 (Fed.Cir.1996). After determining that a case is exceptional, the district court must determine whether attorney fees are appropriate, a determination that we review for an abuse of discretion. *See Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1186, 33 USPQ2d 1823, 1833 (Fed.Cir.1995). A district court abuses its discretion when its decision is based on clearly erroneous findings of fact, is based on erroneous interpretations of the law, or is clearly unreasonable, arbitrary or fanciful. *See Fraige v. American–National Watermattress Corp.,* 996 F.2d 295, 297, 27 USPQ2d 1149, 1151 (Fed.Cir.1993).

**■■** We conclude that the district court's denial of exceptional status was not clearly erroneous. The court specifically noted that it considered the evidence of willful infringement sufficient but weak. Similarly, it considered the evidence of copying also to be weak. The court concluded that Cybor's arguments in litigation, while ultimately unsuc-

cessful, were not frivolous or asserted for an improper purpose and that Cybor litigated in good faith. Finally, the court concluded that evidence supported Cybor's contention that it in good faith did not consider its system to be infringing.

■ Contrary to FAS's assertions, a finding of willful infringement does not require a finding that a case is exceptional. *See Modine Mfg. Co. v. The Allen Group, Inc.,* 917 F.2d 538, 543, 16 USPQ2d 1622, 1624 (Fed. Cir.1990). Moreover, FAS's mere argument that Cybor's defenses and claims were "baseless" and pursued in "bad faith" does not undermine the district court's conclusions to the contrary. The record evidence supports the district court's conclusion that Cybor acted in good faith. Moreover, Cybor's arguments, particularly relating to claim construction and prosecution history estoppel, were not meritless, and resolution of those issues in FAS's favor was far from a foregone conclusion.

■ B. FAS further challenges the district court's decision not to enhance the damages in this case. The statute allows a court to enhance damages "up to three times the amount found or assessed." 35 U.S.C. § 284 (1994). A denial of enhanced damages under § 284 is reviewed on appeal for an abuse of discretion. *See Electro Medical Sys., S.A. v. Cooper Life Sciences, Inc.,* 34 F.3d 1048, 1056, 32 USPQ2d 1017, 1023 (Fed. Cir.1994). Enhanced damages have been awarded when a party is found to have willfully·infringed or to have acted in bad faith. *Id.* A finding of willfulness, however, does not mandate enhanced damages. *See Read Corp.,* 970 F.2d at 826, 23 USPQ2d at 1435. Instead, "[t]he paramount determination ... is the egregiousness of the defendant's conduct based on all the facts and circumstances." *Id.*

■ We conclude that the district court did not abuse its discretion in denying enhanced damages. Particularly, we note that there is no merit to the argument that a finding of willfulness but a denial of enhanced damages is necessarily an abuse of discretion. *See Modine,* 917 F.2d at 543, 16 USPQ2d at 1624. Indeed, the district court determined that the evidence regarding willfulness and copying was weak. Moreover,

although Cybor was found to infringe all twenty of the claims, this result does not mean that the case was not close, particularly in light of its justifiable albeit unsuccessful arguments regarding the prosecution history of the '837 patent. Finally, nothing in the record supports FAS's arguments that Cybor litigated in an inappropriate fashion; the district court actually found the contrary to be true. Thus, we conclude that the district court did not abuse its discretion in denying enhanced damages.

■ C. Finally, FAS contests both the district court's method in calculating damages and the court's ultimate damages award. Section 284 requires that the damages awarded to a claimant must be adequate to compensate for infringement. *See Rite–Hite Corp. v. Kelley Co.,* 56 F.3d 1538, 1544, 35 USPQ2d 1065, 1068 (Fed.Cir.1995) (in banc). The amount of damages determined by a district court is a question of fact that is reviewed for clear error on appeal, while the method used by a district court in reaching that determination is reviewed for an abuse of discretion. *See Stryker Corp. v. Intermedics Orthopedics, Inc.,* 96 F.3d 1409, 1413, 40 USPQ2d 1065, 1068 (Fed.Cir.1996).

■ FAS argues that the district court abused its discretion by using a method that was "too stringent" and thus did·not afford adequate relief. We disagree. The district court performed a thorough, well-reasoned analysis of the facts underlying the award of damages. Contrary to FAS's assertions, the court acted within its discretion in its evaluation of the two-supplier market by concluding that FAS's sale to the purchaser would not have occurred at the same time that the infringing sales occurred because of FAS's prior history with that purchaser. As to the other aspects of the methodology challenged by FAS, we conclude that the district court weighed the evidence before it in an·appropriate fashion. We decline FAS's inappropriate invitation that we essentially reweigh the record evidence.

## CONCLUSION

Because the district court properly denied defendant's motion for JMOL, did not abuse

its discretion in its damages methodology or in its decision not to enhance damages, and did not clearly err. in determining that this case was not exceptional or clearly err in determining the amount of damages, we affirm.

*AFFIRMED.*

PLAGER, Circuit Judge, concurring.

The concerned reader of the several opinions in this case might be led to believe that there is more to this case than there is. This otherwise unremarkable case was taken in banc for the sole purpose of laying to rest any residual doubts about how, in claim construction, the verbalizations surrounding the familiar "fact-law" dichotomy should be understood. I join the court's opinion and judgment, eliminating the unnecessary obfuscation that seems to have emerged since our decision in *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 34 USPQ2d 1321 (Fed.Cir.1995) (in banc) (hereinafter *Markman I*).

In *Markman I* we held that "claim construction is a matter of law," and that "the construction given the claims is reviewed de novo on appeal." *Id.* at 979. The Supreme Court agreed with our view, and concluded that the Seventh Amendment right to trial by jury was not an obstacle. *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 379–86, 116 S.Ct. 1384, 1391–93, 134 L.Ed.2d 577 (1996) (*Markman II*).

At the trial stage of a patent infringement suit, this means that the trial judge is obligated to determine the meaning of the claims, and, if a jury is used for the infringement phase, to instruct the jury accordingly. In the course of seeking to understand the nature and scope of the invention set forth in the claims, it is standard doctrine that the judge focuses on the language of the claims, as explained by the patent's written description, and as constrained by the course of the patent's prosecution. If need be, the trial judge may seek understanding outside the patent proper, from relevant texts and materials, and from experts in the art. None of this involves "fact-finding" in the sense of the traditional fact-law dichotomy. See, for example, the Supreme Court's effort to decide whether a tomato was a "fruit" or a "vegetable." Regarding the meaning of those words, the Court said: "Of that meaning the court is bound to take judicial notice, as it does in regard to all words in our own tongue; and upon such a question dictionaries are admitted, not as evidence, but only as aids to the memory and understanding of the court." *Nix v. Hedden,* 149 U.S. 304, 306–07, 13 S.Ct. 881, 882, 37 L.Ed. 745 (1893).

The effort is to understand the meaning of the terms in the claims. To the extent that involves delving into factual matters, such materials simply become part of the process of understanding. It hardly seems necessary to state that the point of seeking understanding of the terms in which the claims are cast is not for the sake of understanding in the abstract, but to ensure as much as the intrinsic nature of language permits that the court's interpretation is a correct one.

On appeal, this court has the benefit of the trial judge's considered view, and the record of the effort made at trial to assist the judge in understanding the terms of the claim. Though we review that record "de novo," meaning without applying a formally deferential standard of review, common sense dictates that the trial judge's view will carry weight. That weight may vary depending on the care, as shown in the record, with which that view was developed, and the information on which it is based.

It may or may not be true that the trial judge will have had virtually unlimited time and opportunity to pursue the matter. In any event, just where the comparative advantage in claim construction effort and accuracy lies in any particular case will be observable on appeal, and will no doubt influence the weight given to the trial court's view. And just as three minds are deemed better than one in deciding appeals, four minds may often be better than three when a complex claim construction is at issue.

This court's decision in *Markman I,* reaffirmed today, simply means that we do not spend our and appellate counsels' time debating whether the trial court's information base constitutes findings of "fact" or conclusions of "law," with verbally different standards of review. Instead both they and we can focus on the question that the trial court addressed, the question that counts: what do

the claims mean? As we all recognize, that is not always easy to know, and much turns on the answer.

The decision today should help institute a simplified and clarified method by which both trial and appellate courts address claim construction issues, pursuant to the rules established in this court's *Markman I* opinion. Our purpose is to improve the process of patent infringement litigation for the benefit of patentees and their competitors, and ultimately the public. Whether this approach to patent litigation will in the long run prove beneficial remains to be seen. There is every reason to believe it will, and certainly to believe it is better than what we had. But it may be some time before we have enough experience with "Markman hearings" and with appellate review under the new regime to draw any empirically sound conclusions. In such circumstances there is much to be said for refraining from premature and argumentative judgments about what it all means, and for allowing sufficient time to actually see how it works.

BRYSON, Circuit Judge, concurring.

While I join the opinion of the court without reservation, I think it important to note that our adoption of the rule that claim construction is an issue of law does not mean that we intend to disregard the work done by district courts in claim construction or that we will give no weight to a district court's conclusion as to claim construction, no matter how the court may have reached that conclusion. Simply because a particular issue is denominated a question of law does not mean that the reviewing court will attach no weight to the conclusion reached by the tribunal it reviews. In fact, reviewing courts often acknowledge that as to particular legal issues lower tribunals have special competence and their judgments on those legal issues should be accorded significant weight. For example, the Supreme Court typically defers to the construction of a state statute adopted by the regional court of appeals that includes that state. *See Propper v. Clark,* 337 U.S. 472, 486–87, 69 S.Ct. 1333, 1341–42, 93 L.Ed. 1480 (1949). Similarly, this court has routinely noted that although contract interpretation is a question of law, the interpretation of a contract by a Board of Contract Appeals,

in light of the Board's expertise in such matters, "is afforded careful consideration and great respect." *Alvin, Ltd. v. United States Postal Serv.,* 816 F.2d 1562 (Fed.Cir. 1987). Indeed, the Supreme Court has made much the same point in referring to its review of this court's decisions on patent law, noting that the Court would "leave such refinement [of the legal test for applying the doctrine of equivalents] to [the Federal Circuit's] sound judgment in this area of its special expertise." *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* — U.S. —, —, 117 S.Ct. 1040, 1054, 137 L.Ed.2d 146 (1997).

The Supreme Court in *Markman* stated that it would be a rare case in which claim construction would turn on an issue such as a credibility judgment between two competing expert witnesses. *See* 517 U.S. at 388–90, 116 S.Ct. at 1395. Such cases, however, may arise, and in those cases it would be entirely appropriate—and consistent with our characterization of claim construction as a question of law—to factor into our legal analysis the district court's superior access to one of the pertinent tools of construction.

That does not mean that we defer to a district court on legal matters unless we find that the court has committed clear error with respect to an issue that should be characterized as factual. What it means is that we approach the legal issue of claim construction recognizing that with respect to certain aspects of the task, the district court may be better situated than we are, and that as to those aspects we should be cautious about substituting our judgment for that of the district court.

MAYER, Chief Judge, with whom PAULINE NEWMAN, Circuit Judge, joins, concurring in the judgment.

I am compelled to concur in the judgment of the court, but I respectfully disagree with the opinion because it profoundly misapprehends *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The Supreme Court concluded there that the historical record is insufficiently firm to declare that juries construed patent claims in England when the Seventh Amendment to the Constitution was

adopted in 1791. So it decided as a matter of *policy* that judges, not juries, are better able to perform this task given the complexity of evidence and documentation. This was a perilous decision of last resort. For juries regularly render verdicts in civil cases based on complex forensic and documentary evidence of equal or greater difficulty than seen in patent cases. And the implications for criminal cases under Article III and the Sixth Amendment are even more profound. Increasingly complex cases involving scientific and complicated documentary evidence are·presented to criminal juries which, of course, decide matters of life and liberty, not merely money. Nevertheless, having so ruled, it seems to me the Court would not also have repealed part of the Federal Rules of Civil Procedure and Evidence without so much as a mention that district courts no longer have discretion to admit expert evidence, *see Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and need not find facts when evidence is disputed in these cases. Nor would it have so excused this court from the normal, historical role of appellate courts to review for reversible error, and installed it as a collegial trial court.

## I. *STANDARD OF REVIEW*

We review the denial of a motion for judgment as a matter of law de novo by reapplying the same standard. *See Read Corp. v. Portec, Inc.,* 970 F.2d 816, 821, 23 USPQ2d 1426, 1431 (Fed.Cir.1992). Under this standard, appellant must show that "the jury's factual findings, presumed or express, are not supported by substantial evidence or, if they are, that the legal conclusions implied from the jury's verdict cannot in law be supported by those findings." *Alpex Computer Corp. v. Nintendo Co.,* 102 F.3d 1214, 1221, 40 USPQ2d 1667, 1672 (Fed.Cir.1996) (quoting *Kearns v. Chrysler Corp.,* 32 F.3d

1541, 1547–48, 31 USPQ2d 1746, 1751 (Fed. Cir.1994)).

Our review of claim construction is controlled by the Supreme Court's judgment in *Markman,* 517 U.S. 370, 116 S.Ct. 1384, not the opinion of this court it reviewed, 52 F.3d 967, 34 ·USPQ2d 1321 (Fed.Cir.1995); the Supreme Court did not adopt this court's reasoning as its own. Though it could have done so easily, the Court chose not to accept our formulation of claim construction: as a pure question of law to be decided *de novo* in all cases on appeal.[1] If it had, there would have been no need for its extensive exegesis about the Seventh Amendment and whether juries must construe claims that have evidentiary underpinnings or whether the importance of uniformity is best served by giving these evidentiary questions of meaning to a judge. It would have been a simple matter for the Court to give short shrift to this argument by proclaiming construction purely, solely, and always a matter of law that would never have gone to the jury.

The Supreme Court recognized that in some cases there will be conflicting evidence that has to be resolved—where there are factual determinations that are more than just incident to claim construction—such as the understanding of one skilled in the art at the time the patent application was filed. In these cases, all that *Markman* stands for is that the judge will do the resolving, not the jury. Wisely, the Supreme Court stopped short of authorizing us to find facts *de novo* when evidentiary disputes exist as part of the construction of a patent claim and the district court has made these findings without committing clear error. *See Fromson v. Anitec Printing Plates, Inc.,* 132 F.3d 1437, 1446, 45 USPQ2d 1269, 1275 (Fed.Cir.1998) (findings of fact made by a district court to resolve disputes as to the meaning of claim terms are affirmed absent clear error); *Eastman Ko-*

---

**1.** Rather than bluntly force the square peg of claim construction into the round hole of fact or law, the Court described the questions presented by claim construction in more chary terms: "[b]ut the *sounder* course, *when available,* is to classify a mongrel practice," "no clear answers," "*in theory there could be a case,*" "*leaves us doubtful,*" "[i]n the main," "[w]e accordingly *think* there is sufficient reason *to treat* construction of terms of art like many other responsibili-

ties that we ceded to a judge," "independent reason *to allocate,*" "*treating* interpretive issues *as* purely legal will promote...." *Markman,* 517 U.S. at 377–91, 116 S.Ct. at 1390–96 (emphasis added). Even a cursory reading of that opinion indicates that the Court meant to determine who should interpret the claims, without mandating a standard of appellate review to be ·used under all circumstances.

*dak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1555–56, 42 USPQ2d 1737, 1742 (Fed.Cir.1997) (reliance on expert testimony to clarify ambiguous claim term is acceptable and deference is given to the trial court's credibility determination). Rather, when the judge finds facts or accepts the factual determinations of a jury, those facts are entitled to greater deference than *de novo* fact finding on appeal.

In *Fromson*, the trial judge admitted expert testimony to develop the record on the meaning of the word "anodized," as it was understood by one skilled in the art at the time of the invention. *Fromson*, 132 F.3d at 1444–45, 45 USPQ2d at 1273–74. Based on that extrinsic evidence, he found "in 1973 no reasonable practitioner of this process would have had the opinion that a non-porous non-adherent oxide coating, as thin as the native 5 nanometer coating found naturally in the environment, of phosphoric oxide, constituted an anodized surface." *Id.* at 1444, 45 USPQ2d at 1274. This finding limited the meaning of the word anodized beyond what a standard definition required: "[T]o subject [a metal] to action by making [it] the anode of a cell before coating with a protective or decorative film." *Id.*, 132 F.3d 1437, 45 USPQ2d at 1273 (quoting Webster's Third Int'l Dictionary). This finding also conflicted with the alleged infringer's description of its own oxide coating process as anodization. Nevertheless, the district court construed the word anodized to mean: "an electrolytically formed, adherent, porous aluminum oxide coating sufficiently thick (meaning thicker than native oxide)...." *Id.* at 1445, 45 USPQ2d at 1274. Because the accused process did not form an oxide coating thicker than native oxide, the district court entered a judgment of noninfringement.

Even had we disagreed with the construction given by the trial court in *Fromson*, we were not tasked by our standard of review to reexamine *de novo* each of the days of testimony and volumes of record relating to interpretation of the word anodized. This court did not affirm the trial court's judgment because it had educed the best construction of the word anodized. It did so because the district court's construction was properly predicated on a factual finding about what anodized meant to one skilled in the art in

1973, which on the appellate record presented by the parties was not clearly erroneous. The Supreme Court never contemplated in *Markman* that we feign first-hand experience with the technology, or that we embellish our abilities by construing a claim without the respect due both a trial court's decision that a factual dispute underlies the meaning of a claim term and its resolution of that dispute.

Provided that no factual findings about disputed terms were necessarily made in the course of construing the claim, our making a claim construction that supersedes that of the district court is not inconsistent with the Court's opinion. *See Serrano v. Telular Corp.*, 111 F.3d 1578, 42 USPQ2d 1538 (Fed. Cir.1997) (construction of the claims involved no factual disputed between the parties); *International Communication Materials, Inc. v. Ricoh Co.*, 108 F.3d 316, 318–19, 41 USPQ2d 1957, 1958–59 (Fed.Cir.1997); *Alpex*, 102 F.3d 1214 (using Alpex's expert testimony against Alpex, there were no factual dispute between the parties); *Metaullics Sys. Co. v. Cooper*, 100 F.3d 938, 939, 40 USPQ2d 1798, 1799 (Fed.Cir.1996); *Insituform Techs., Inc. v. Cat Contracting, Inc.*, 99 F.3d 1098, 40 USPQ2d 1602 (Fed.Cir.1996) (attorney argument regarding claim construction presented no factual dispute about the technology); 1 S. Childress & M. Davis, *Federal Standards of Review: Civil Cases and General Review Principles*, §§ 2.13, 2.14 (2d ed.1991). If this court does not believe the claim construction to be erroneous based on an independent review of the legal conclusions and a review of the constituent factual findings for substantial evidence, it must affirm. *See Bose Corp. v. Consumers Union of United States*, 466 U.S. 485, 514 n. 31, 104 S.Ct. 1949, 1967 n. 31, 80 L.Ed.2d 502 (1984); *see also Pullman–Standard v. Swint*, 456 U.S. 273, 287–88, 102 S.Ct. 1781, 1789–90, 72 L.Ed.2d 66 (1982).

This court may not, however, independently review the constituent facts or disregard the jury's findings, absent proof that they lack sufficient evidence that "a reasonable mind might accept as adequate to support" them. *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.

126 (1938); *see Genentech, Inc. v. Wellcome Found. Ltd.,* 29 F.3d 1555, 1565, 31 USPQ2d 1161, 1169 (Fed.Cir.1994). Nor may we construe a claim in a manner that is inconsistent with our function as a court of review; we cannot divine new interpretations of terms in a claim or make findings of fact from a record that cannot support them. *See Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,* 853 F.2d 1557, 1561, 7 USPQ2d 1548, 1551 (Fed.Cir.1988).

Sometimes it may be necessary for an appellate court to pronounce new legal principles during an appeal. However, even if this court identifies a question of claim construction as one of law—though its resolution is relevant to only the particular litigation or document—it cannot elevate the activity to one of determining legal principles, as is for example, statutory construction. *See Markman,* 517 U.S. at 391, 116 S.Ct. at 1396 ("[I]ssue preclusion could not be asserted against new and independent infringement defendants even within a given jurisdiction...."); *In re Freeman,* 30 F.3d 1459, 1466, 31 USPQ2d 1444, 1450 (Fed.Cir.1994); *Jackson Jordan, Inc. v. Plasser American Corp.,* 747 F.2d 1567, 1574–75, 224 USPQ 1, 5–6 (Fed.Cir.1984) (second alleged infringer not bound by prior claim construction unless it had, *inter alia,* a full and fair opportunity to litigate the construction in the first infringement action). Thus, regardless of the labels we attach to these questions, without the benefit of a full record from the trial court, it is neither the function of this court nor is it within our capacity as an appellate court to adopt new interpretations, most especially not if the interpretation under review is of terms informed by conflicting evidence. Such indiscriminate and conclusive review deprives the parties of important substantive and procedural mechanisms provided in the trial courts, where interpretation can be informed by additional discovery and expert testimony, and where it can be checked by appellate review as a matter of right. If claim construction is only a question of law to be reviewed by this court *de novo,* then the absence of review as a matter of right over *our* claim constructions, which may be new and unsupported by legal analysis, or may never have been tested by the adversarial process, would transform this court into a trial court of first and usually last resort.

## II. *METHOD OF REVIEW*

To determine whether a patent has been infringed, a district judge must partake of a two-step analysis: (1) construction of the claims to determine their legal effect by examining and resolving, *inter alia,* factual disputes over the meaning and scope of technical words or terms of art used in the patent, *see Fromson,* 132 F.3d at 1442, 45 USPQ2d at 1272; *Markman,* 52 F.3d at 999, 34 USPQ2d at 1347 (Newman, J., dissenting); and (2) a comparison of the properly construed claims to the accused device, *see Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.,* 15 F.3d 1573, 1576, 27 USPQ2d 1836, 1839 (Fed.Cir.1993). The first step, construction of the claim, is ultimately a question for the judge. *See Markman,* 517 U.S. at 388, 116 S.Ct. at 1395 ("So it turns out here, for judges, not juries, are the better suited to find the acquired meaning of patent terms.") In construing the claims, a judge looks to the claims themselves, the specification, the prosecution history of the patent, *see Minnesota Mining and Mfg. Co., v. Johnson & Johnson Orthopaedics, Inc.,* 976 F.2d 1559, 1566, 24 USPQ2d 1321, 1327 (Fed. Cir.1992), and, if necessary, extrinsic evidence for information or to resolve disputes over the meaning of terms, *see Texas Instruments, Inc. v. United States Int'l Trade Comm'n,* 988 F.2d 1165, 1171, 26 USPQ2d 1018, 1023 (Fed.Cir.1993). Although *Markman,* 517 U.S. 370, 116 S.Ct. 1384, requires the judge to make the ultimate determination about the meaning and legal consequence of a claim, it does not prohibit him from submitting subsidiary factual disputes to a jury, even if it does not encourage it.

The judge follows the same first step to construe claims containing means-plus-function limitations under 35 U.S.C. § 112(6) (1994). *See Alpex,* 102 F.3d at 1220, 40 USPQ2d at 1672; *Intellicall, Inc. v. Phonometrics, Inc.,* 952 F.2d 1384, 1388, 21 USPQ2d 1383, 1387 (Fed.Cir.1992). However, to complete the construction of these means-plus-function terms, the judge must look to the structures, materials, or acts

disclosed in the patent's specifications and to their equivalents. *Id.*, 952 F.2d at 1388, 21 USPQ2d at 1387. To determine the scope of such equivalents, the district court must resolve questions of fact by resorting to the expertise of the fact finder. *Cf. Markman*, 52 F.3d at 977 n. 8, 34 USPQ2d at 1337, n. 8 (expressly declining to reach "the issue of whether a determination of equivalents under § 112, para. 6 is a question of law or fact"); *In re Hayes Microcomputer Prods., Inc.*, 982 F.2d 1527, 1541–43, 25 USPQ2d 1241, 1253 (Fed.Cir.1992) ("This list [of factors that may be considered when determining the scope of a means-plus-function limitation] is not exhaustive and reasonable inferences by the fact finder are appropriate."); *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 862–63, 226 USPQ 402, 408–09 (Fed.Cir. 1985); *Palumbo v. Don–Joy Co.*, 762 F.2d 969, 975–76, 226 USPQ 5, 8 (Fed.Cir.1985) ("Whether that accused device is a § 112 equivalent ... is a question of fact."); *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1575, 225 USPQ 236, 239 (Fed.Cir.1985). For pragmatic reasons, the resolution of this factual determination is often made at the same time the fact finder determines infringement (step two, described below).

The second step of the infringement analysis requires a factual comparison of the claimed invention to the accused device, which is done by the fact finder. *See Winans v. Denmead*, 56 U.S. (15 How.) 330, 338, 14 L.Ed. 717 (1853). To prove literal infringement, the patentee must show that the accused device contains every limitation in the asserted claims. *See Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 397, 29 USPQ2d 1767, 1769 (Fed.Cir.1994). If tried to a jury, it is the jury's factual findings on infringement that are reviewed by this court for lack of substantial evidence, *see Genentech*, 29 F.3d at 1565, 31 USPQ2d at 1168–69, as part of this court's reapplication of the standard for judgment as a matter of law.

A claim of infringement under the doctrine of equivalents modifies this second step by requiring that the fact finder determine whether differences between particular elements of the accused device and the asserted claims are insubstantial. *See Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, —

U.S. ——, ——, 117 S.Ct. 1040, 1054, 137 L.Ed.2d 146 (1997). However, because they have separate origins, purposes, and applications, determining equivalence under paragraph 112(6) requires an analysis different from that used to determine equivalence under the doctrine of equivalents. *See Alpex*, 102 F.3d at 1222, 40 USPQ2d at 1673 ("Under § 112, the concern is whether the accused device, which performs the claimed function, has the same or an equivalent structure as the structure described in the specification corresponding to the claim's means. Under the doctrine of equivalents, on the other hand, the question is whether the accused device is only insubstantially different than the claimed device.") (internal citations omitted).

After the judge construes the means-plus-function limitations identifying structures, materials, or acts described in the patent's specification, and their equivalents as determined by the fact finder (step one, described above), the judge gives the construed claims to the fact finder, in this case a jury, for a determination of infringement. *See D.M.I.*, 755 F.2d at 1575, 225 USPQ at 239. For literal infringement, the fact finder must determine whether the accused device performs an identical function to the one recited in the means-plus-function clause. *See Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934, 4 USPQ2d 1737, 1739 (Fed.Cir. 1987) (if the identical function is not performed, literal infringement is not possible). If the identical function is performed, the fact finder must then determine whether the accused device utilizes the same structure or materials as described in the specification, or their equivalents.

Just as the fact finder's infringement analysis differs between equivalence under paragraph 112(6) and the doctrine of equivalents, so too differs the analytical effect of statements made during the prosecution of the patent on construction of the claims. Under paragraph 112(6), a statement made during prosecution may confine the range of equivalent structures, materials, or acts that are directly claimed by the patent. However, in the context of a doctrine of equivalents analysis, the patentee seeks protection beyond

that claimed by the patent directly. As such, the judge's construction of the claims—which includes the interpretation of claim terms—may not be sufficient to remove from the jury's consideration all subject matter that was disclaimed during prosecution.

Prosecution history estoppel addresses this problem by excluding equivalents surrendered during prosecution. Under this doctrine, statements made to overcome rejections based, as here, on prior art estop the patentee from extending its right to exclude others from making, using, or selling subject matter known to be insubstantially different from, or interchangeable with, claimed elements at the time of the alleged infringement. *Warner–Jenkinson,* —— U.S. at ——, 117 S.Ct. at 1053. Although both forms of equivalence require the district court to examine the prosecution history as part of its construction of the claims, under the doctrine of equivalents, the judge gives the claim, properly construed to exclude disclaimed subject matter, to the jury and then, where appropriate, also instructs the jury on the possible range of equivalents that it may or may not consider due to prosecution history estoppel.

### III. *REVIEW*

As depicted in figure two of the patent, *ante* at 1452 [maj. opn], the '837 patent discloses a dual-stage pump. It claims a first pumping means that pumps fluid through a filtering means "to" a "second pumping means." It also claims a "means to enable said second pumping means to collect and/or dispense the fluid, or both," at rates or during periods that are independent of the operation of the first pumping means. As a result of this structure, the pump described in the '837 patent is able to accumulate fluid for later dispense, dispense fluid immediately, or partially accumulate and partially dispense fluid in precise measurements and at precise times. The preferred embodiment describes a second pumping means where the second pump collects and dispenses the fluid from its own internal reservoir.

Like the pump disclosed in the '837 patent, Cybor Corporation's Model 5226 dual-stage pump also allows users to pump or dispense highly accurate amounts of liquid chemicals in increments as small as 0.1 microliter. Both pumps are primarily used for accurately dispensing chemicals—such as photoresist and polimide—onto semiconductor wafers during their fabrication.

Of relevance to this appeal, in construing the '837 patent the district judge interpreted the disputed term "to" and submitted the term to the jury for a determination of infringement. The judge also submitted the terms "second pumping means," "means to enable said second pumping means," and "or both" to the jury as means-plus-function terms, along with structures in the '837 patent's specification, for a determination of infringement. The judge left the task of considering prosecution history estoppel to the jury.[2] The jury found that Cybor's Model 5226 pump literally infringed claims 1–10, 13–15, and 17–20, and that it infringed claims 11, 12, and 16 under the doctrine of equivalents. It is unclear which combination of components in Cybor's Model 5226 pump the jury found to infringe claims 1–10, 13–15, and 17–20. It may have interpreted "second pumping means" in such a way that it found either Cybor's second pump or the combination of its second pump and its external reservoir to be equivalent structures to those provided in the specification of the '837 patent corresponding to the "second pumping means." Likewise, the jury may have interpreted "means to enable said second pumping means" in such a way that it found either Cybor's external reservoir or the combination of its external reservoir and its second pump to be equivalent structures to those provided in the specification of the '837 patent corresponding to the "means to enable said second pumping means." In total, there are five possible combinations of claim term interpretations and findings of paragraph 112(6) equivalents that would have led the jury to its infringement verdict.

---

**2.** Although having a jury make a legal determination of the effect of statements made during prosecution of the patent is error, alone this error was harmless because to find infringement, the jury must have arrived at the same legal conclusion that we did on appeal: that the prosecution history does not exclude Cybor's external reservoir from the jury's consideration of equivalents under paragraph 112(6).

Cybor renewed its earlier motion for judgment as a matter of law pursuant to Rule 50(b) and for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure, on the basis that no reasonable juror could find that its pump infringes the '837 patent. The court denied the motion, finding "that the jury's infringement verdict is supported by the evidence ... the jury instructions were proper and the verdict was not against the clear weight of the evidence or contrary to the instructions." Cybor moved for reconsideration, arguing that this court's then recently issued *Markman*, 52 F.3d 967, 34 USPQ2d 1321, required that the judge, and not the jury, interpret all the claims. The district court denied the motion and entered final judgment, from which Cybor appealed.

On appeal, Cybor argues that had the district court properly analyzed the prosecution history of the '837 patent, it would have excluded reservoir structures like Cybor's from consideration as an equivalent under paragraph 112(6). Cybor further argues that the judge would have instructed the jury not to consider its reservoir when determining whether Cybor's second pump has the same or an equivalent structure as the structure in the portions of the '837 patent's specification corresponding to the second pumping means. Without its reservoir, Cybor argues that its second pump cannot infringe the "second pumping means" limitation, the "or both" functional limitation, or the filter means "to" second pumping means limitation. Cybor also argues that the district judge erred in failing to identify the corresponding structures in the specification, and in permitting the judge to consider the effect of statements made during prosecution of the '837 patent.

FAS responds that the district court properly considered and rejected Cybor's argument about the prosecution history of the '837 patent, that it properly construed the necessary claims, and that it properly submitted them along with relevant corresponding structures—as described in the specification—to the jury for a determination of infringement. FAS further argues that the district court was not obliged, either before or after *Markman*, to submit complete claim constructions to the jury so long as the judge's ultimate claim construction is supported by the jury's factual findings, pre-

sumed or expressed, regarding disputed claim terms, and so long as the judge later evaluates and sustains the jury's factual findings.

Claim 1 of the '837 patent contains three disputed limitations and is representative of how these limitations are used, where they appear throughout the 20 asserted claims:

In a device for filtering and dispensing fluid in a precisely controlled manner, the combination of:

first pumping means;

*second pumping means* in fluid communication with said first pumping means; and

filtering means between said first and *second pumping means,* whereby said first pumping means pumps the fluid through said filtering means *to* said second pumping means;

in which each of said first and second pumping means includes surfaces that contact the fluid, said surfaces being of materials that are non-contaminating to industrial fluids which are viscous and/or high purity and/or sensitive to molecular shear; and

comprising *means to enable said second pumping* means to collect and/or dispense the fluid, *or both,* at rate or during periods of operation, or both which are independent of rates or periods of operation, or both, respectively, of said first pumping means.

'837 patent, col. 9, lines 45–61 (emphasis and formatting added). The specification of the' 837 patent further describes the "second pumping means" as having tubing that connects the pump to the second incremental pump advancement means, col. 5, lines 49–52, a diaphragm inside the second pump, col. 6, lines 2–3, and a separate inlet passage and outlet passage, col. 7, lines 10–20.

During prosecution, the inventors further limited the scope by making the following statements to overcome a prior art rejection that the claimed invention was unpatentable over Storkebaum et al., U.S. Patent No. 4,749,476.

Additionally, Storkebaum specifically provides a separate container 12 for collecting

the permeate. Obviously, Storkebaum does not teach the collection of fluid in a second pumping means.... Storkebaum discloses a permeate collecting container 12 that is *separate* from the conveying pump 13. Nothing in Storkebaum discloses or makes obvious the claimed invention, nor the precise and flexible control provided by the second pump means of Claim 1.

Given the nature and function of the Storkebaum container, these statements were made to distinguish the invention over the prior art. They confine the possible interpretation of terms in the claims under paragraph 112(6) and they may prevent FAS's desired use of the doctrine of equivalents. *See Warner–Jenkinson,* — U.S. at — n. 7, 117 S.Ct. at 1051 n. 7. However, in this case the limitation of possible equivalents extends only so far as was necessary to distinguish aspects of the invention's "second pumping means" from Storkebaum's external container. The statements do not require that the district judge provide the jury with more specific interpretations of claim terms because the inventors disclaimed the use of a separate, physically unattached reservoir that cannot achieve differential pumping rates between the two pumps by accumulating fluid in a reservoir—the function performed by the '837 patent's "means to enable said second pumping means."

Storkebaum's separate container collects permeate and vents the fluid; it is designed to feed a conveying pump that is part of a big circulation loop, not a fluid dispensing device. Because the inventors never disclaimed an external reservoir that accumulates fluid to permit different pumping rates and because equivalence under paragraph 112(6) is a question of fact, the district court properly permitted the jury to consider the structure of Cybor's external reservoir as a possible equivalent, under paragraph 112(6), to structures in the '837 patent's specification that define the "second pumping means" and the "means to enable the second pumping means." It was also proper for the district court to permit the jury to consider Cybor's reservoir in measuring the substantiality of differences between its device and the invention claimed by the '837 patent, under the doctrine of equivalents.

### A. *"Second Pumping Means"*

### *"Means to Enable Said Second Pumping Means"*

As to these two disputed limitations, each of the independent claims, except for claim 16, uses the term "second pumping means," which the court interpreted in means-plus-function language as: "a structure identical to the structure disclosed in the specification of the patent or the equivalent of that structure which performs the function of a fluid accumulator/dispense pump." The district court also interpreted the term "means to enable said second pumping means," which appears in each of the independent claims except claims 10, 16, and 17, in means-plus-function language, as: "a structure identical to the structure disclosed in the specification of the patent, or the equivalent thereof, which allows the second pumping means to [accumulate, dispense, and partially collect and dispense fluid at rates and during periods independent of the first pumping means]."

Cybor argues that these means-plus-function elements should be limited to the exact structures disclosed in the claims and the specification of the '837 patent. However, paragraph 112(6) permits the disclosure of specific structures in the specification, without limiting protection to the disclosed structures. *See* 35 U.S.C. ¶ 112(6) ("[S]uch claims shall be construed to cover the corresponding structure, materials, or acts described in the specification and equivalents thereto."); *D.M.I.,* 755 F.2d at 1574, 225 USPQ at 238. Cybor is correct that the reservoir and the second pump in its dual-stage pump are not identical to the structure disclosed in the specification of the '837 patent; they contain a valve unlike the disclosed structure, and if uncoupled from the attached reservoir, the pump does not permit the partial accumulation and partial dispensing of fluid as contemplated by the term "flow through" in the '837 patent. However, as explained above, the prosecution history does not require the district court to uncouple the valve or separate the reservoir from the second pump before submitting the terms "second pumping means" and "means to enable said second pumping means" to the jury.

The '837 patent's preferred embodiment shows the reservoir inside the second pump, but nothing requires such a restriction, and limitations in the specification should not be read into the claims. *See Constant v. Advanced Micro–Devices, Inc.*, 848 F.2d 1560, 1570–71, 7 USPQ2d 1057, 1064 (Fed.Cir. 1988). Finally, such a restriction would go against the clear weight of testimony submitted by FAS's expert witnesses, Clark, who was qualified as one skilled in the art of fluid dynamics, and Snodgrass and Gibson.

"As in all cases involving assertions of equivalency, wherein the patentee seeks to apply its claims to structures not disclosed by the patentee, the court is required to exercise judgment." *Texas Instruments, Inc. v. United States Int'l. Trade Comm'n*, 846 F.2d 1369, 1371, 6 USPQ2d 1886, 1889 (Fed.Cir. 1988). Here, the district court exercised its judgment, made a partial, though legally sufficient interpretation of these limitations, and presented them to the jury for resolution of factual disputes on the way to determining equivalents under paragraph 112(6). Based on these interpretations and the jury's verdict, we presume [3] that the jury found that the combination of one of Cybor's Model 5016 pumps with the external reservoir it uses in its Model 5226 pump created a structural equivalent to the "second pumpiing means" or the "means to enable said second pumping means" claimed in the '837 patent and described by the specification under paragraph 112(6). Because we have not been shown that the jury lacked substantial evidence to support this finding of equivalents or infringement, we must affirm.

However, if the court is correct that claim construction is purely and solely a question of law to be reviewed *de novo* on appeal, it could not affirm the judgment of infringement. Infringement was determined in this case by a jury at the same time that it was asked to construe these claims by resolving factual disputes about their meaning and to determine whether the scope of these claims should be limited by arguments made during prosecution of the patent. Ordinarily, a jury's verdict of infringement permits us to presume the existence of factual findings necessary to that verdict. But we are in no way entitled to presume factual findings or even to rely on the verdict of infringement where neither the jury, nor the judge on a motion for judgment as a matter of law, articulated a construction of the claims upon which the findings are premised. As explained above, there are five possible combinations of claim term interpretations and findings of paragraph 112(6) equivalents that could have led the jury to its infringement verdict. In light of the possibilities, it is difficult to imagine how the court can affirm the jury's finding of infringement based upon its own *de novo* claim construction, which merely presumes a claim construction by the district court and that admits of no deference to the findings of fact.

The effect of allowing such a combination of presumptions in this case has been to deny Cybor meaningful review of anything more than the district judge's decision not to apply prosecution history estoppel, since it was the only legal determination that can be located outside of those presumptions. Not surprisingly, this is the decision Cybor contests most strenuously on appeal. The effect has also been to allow this court to presume that it made the same claim construction as the jury, without so much as articulating its own construction of these two claim terms, and then to presume that the jury's infringement finding is still valid. Penultimately, Cybor is left with little more than the ability to make presumptions as to our own claim interpretations in any motion it may file for reconsideration. Worse still is the message the court is sending to district courts: we will affirm a finding of infringement as long as the district court avoids articulating its construction of the claims—which coincidentally leaves us free to arrive at our own constructions—and as long as we can presume that the jury used

---

3. Findings of fact are presumed where they would be necessary to support a jury's verdict. *See Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893, 221 USPQ 669, 673 (Fed.Cir. 1984) ("To facilitate review on a motion for [judgment as a matter of law] and on appeal, it is preferred that a jury be provided with special interrogatories designed to reveal more clearly the findings it made. Absent such interrogatories, the law presumes the existence of findings necessary to support the verdict the jury reached."); *see also Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1516, 220 USPQ 929, 939 (Fed.Cir.1984).

our constructions to arrive at that finding of infringement.

### B. *"To"*

The second of these three disputed claim limitations, "pumps fluid through said filtering means to said second pumping means," is the only one that the district court did not analyze as part of a means-plus-function limitation. Cybor argued that the fluid has to be pumped directly to the second pump. FAS maintains that it is enough that the fluid merely reaches the second pump. The district court interpreted the term "to" as pumping "towards and with a destination of" the second pump and left the determination of infringement to the jury. Absent its prosecution history estoppel argument, there remains little to Cybor's interpretation of this claim limitation. FAS presented sufficient expert testimony from Gibson and Clark that the fluid must merely be pumped "ultimately" to the "second pumping means." This evidence is consistent with the expert testimony of Snodgrass and Gibson that the "to" limitation requires only a designed or dedicated pathway between the two pumping means, which Cybor's device possesses. Because all experts were consistent in their testimony about the meaning of terms to one skilled in the art, there was no occasion here for the court to resolve a factual dispute over the meaning of a term en route to their interpretation. Moreover, because the interpretation of this claim limitation describes Cybor's Model 5226 dual-stage pump, regardless of whether or not the reservoir is part of the second pumping means, no reasonable juror could use this as a basis for finding noninfringement, and I agree we can affirm this aspect of the district court's judgment.

### C. *"Or Both"*

The third disputed limitation, "or both" is contained within means-plus-function language, it describes a function of the "means to enable second pumping means," and it must be a function of Cybor's device if the fact finder is to consider equivalence under paragraph 112(6). Cybor argues solely that the inventor of the '837 patent disclaimed external reservoirs such as its own, by distinguishing Storkebaum. Thus the jury should not consider its external reservoir when it determines whether the Model 5226 dual-stage pump contains structural equivalents to each of the relevant limitations disclosed in the '837 patent. Given the prosecution history analysis and the jury's presumed finding that Cybor's reservoir and second pump contain equivalents of all the limitations to the "means to enable said second pumping means," Cybor's argument cannot stand. The jury had substantial evidence upon which to find that Cybor's reservoir and second pump together can collect, dispense, and both collect and dispense fluid, so its finding of infringement is also sufficient.

### IV. *JUDGMENT AS A MATTER OF LAW*

Finally, Cybor argues that Markman, 52 F.3d 967, 34 USPQ2d 1321, requires that the judge determine the meaning of the claim before submitting it to the jury. However, that opinion said that the judge must determine the meaning of a claim, but that the meaning need not be established before the claims are submitted to the jury. *Markman,* 52 F.3d at 981, 34 USPQ2d at 1331 (pronouncing the meaning of a claim "ordinarily can be accomplished by the court in framing its charge to the jury, but may also be done in the context of dispositive motions such as those seeking judgment as a matter of law.") The risk of waiting, of course, is that the jury's deliberative efforts on infringement may be rendered useless if the instruction was improper and the affected factual dispute was material to the verdict. Here, this happens only under the court's standard of review. Moreover, given the nature and interrelatedness of these disputed limitations and the underlying factual questions—whether the combination of Cybor's second pump and its reservoir is a paragraph 112(6) equivalent to the "second pumping means" or the "means to enable said second pumping means"—it is difficult to see how the district court could have better instructed the jury, absent the use of detailed and alternative special verdicts. Therefore, I see no reversible error in the district court's limited claim interpretations or its denial of Cybor's motion for judgment as a matter of law.

RADER, Circuit Judge, dissenting from the pronouncements on claim interpretation in the én banc opinion, concurring in the judgment, and joining part IV of the en banc opinion.

The *en banc* court chooses this case, resolvable under the prosecution history estoppel doctrine, to state that it accords no deference to the district court's central role in patent litigation, namely claim interpretation. Yet, based on this court's unanimous concurrence in the judgment, the standard of review does not affect the outcome in this case. Accordingly, this case obscures what really is at stake when claim construction is subject to de novo review and appellate revision.[1]

In *Markman I*, this court *en banc* declared that claim interpretation resides solely with the judge. The Supreme Court agreed. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 371–73, 116 S.Ct. 1384, 1387, 134 L.Ed.2d 577 (1996) (*Markman II*). By removing lay juries from complex technological decisions, these decisions promised to improve the predictability and uniformity of patent law. *See Markman II*, 517 U.S. at 390–91, 116 S.Ct. at 1395–96.

To evade the strictures of the Seventh Amendment, *Markman I* necessarily reasoned that claim construction is purely a matter of law. As a pure question of law, claim construction became subject to plenary appellate review. Because jury involvement remained the focus of *Markman I*, the Supreme Court did not address appellate review of claim construction. Instead the Supreme Court repeatedly intimated that claim construction was not a purely legal matter. *See, e.g., Markman II*, 517 U.S. at 377–79, 116 S.Ct. at 1389–91 (calling the construction of a term of art following receipt of evidence a "mongrel practice"); *id.* at 388, 116 S.Ct. at 1395 (suggesting that claim interpretation " 'falls somewhere between a pristine legal standard and a single historical fact' " (quoting *Miller v. Fenton*, 474 U.S. 104, 114, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985))); *id.* at 390, 116 S.Ct. at 1396 ("notwithstanding [claim construction's] evidentiary underpinnings"). Nonetheless, in the time since *Markman II*, this court has repeatedly extolled its own authority to "review the issue of claim interpretation independently *without deference* to the trial judge." *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1556, 35 USPQ2d 1801, 1803 (Fed.Cir.1995) (*Lubrizol*) (emphasis added); *see also Hoechst Celanese Corp. v. BP Chem. Ltd.*, 78 F.3d 1575, 1578, 38 USPQ2d 1126, 1128 (Fed. Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 275, 136 L.Ed.2d 198 (1996). Indeed, at one point, this court noted that its law requires "independent determination of the construction of the claims, as a matter of law, unencumbered by the trial process." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 72 F.3d 857, 863, 37 USPQ2d 1161, 1165 (Fed.Cir.1995), *vacated and remanded on other grounds*, —— U.S. ——, 117 S.Ct. 1240, 137 L.Ed.2d 323 (1997). Unencumbered by the trial process? Far from an encumbrance, the Supreme Court suggests that the trial should be the "main event." *Wainwright v. Sykes*, 433 U.S. 72, 90, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977).

Because jury issues dominated *Markman I*, this court has yet even to receive briefing and oral argument on the proper standard of review for a trial court's claim construction. Nonetheless this court relies on its earlier *en banc* decision, *Markman I*, 52 F.3d at 979, to make claim construction purely a question of

---

1. In fact, the district court submitted this case to a jury *before* this court decided *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979, 34 USPQ2d 1321, 1329 (Fed.Cir.1995) (*Markman I*). Thus, the district court's jury instructions only partially construed the claims, and the *en banc* opinion relies, as it must, upon what it presumes must have been the jury's claim construction. Nor did the district court deliberately accept and rely upon expert testimony to understand and interpret the claim terms, a central issue in *Markman I*. Heedless of these problems, this court has selected this case for *en banc* review. *Fromson v. Anitec Printing Plates, Inc.*, 132 F.3d 1437, 45 USPQ2d 1269 (Fed.Cir.1997), may have been a more suitable choice for meaningful *en banc* consideration of the issue of appellate deference in claim construction. The district court decided *Fromson* by applying the *Markman I* regime. The *Fromson* district court also relied upon extrinsic evidence and findings of scientific/technologic fact to interpret the meaning of claim terms to one of ordinary skill in the art at the time of the invention (over twenty years ago). Thus, the facts of *Fromson* might have better illustrated how different standards of review can direct the outcome on appeal.

law, subject to independent appellate review without deference to or encumbrance by the trial process. To my eyes, this rejection of the trial process as the "main event" will undermine, if not destroy, the values of certainty and predictability sought by *Markman I*.

## I.

The question of the proper standard of review seems an esoteric legal topic of interest only to law professors and appellate judges. In most cases, however, the review standard influences greatly both the trial judges who preside over the trial process and patent practitioners who must advise clients to accommodate their business plans to an uncertain legal regime.

From the vantage point of trial judges, *Markman I* dictates many deviations from the normal procedural course for litigation.[2] Perhaps the central deviation, however, affects the trial court's discretion to use expert testimony. When confronted with sophisticated technology, district court judges often seek testimony from experts to help them understand and interpret the claim. Under the guise of setting standards for claim construction, this court instructs experienced trial judges that they may use experts to understand, but not to interpret, the claim terms. As a matter of logic, this instruction is difficult to grasp. What is the distinction between a trial judge's understanding of the claims and a trial judge's interpretation of the claims to the jury? Don't judges instruct the jury in accordance with their understanding of the claims? In practice, how does this court's lofty appellate logic work? As this court acknowledges, a trial court must often resort to experts to learn complex new technologies. *See, e.g., Markman I*, 52 F.3d at 986. What happens when that learning influences a trial judge's interpretation of the

2. The following is an incomplete list of procedural deviations required by *Markman I:*

1. Multiple trials, problem I: If hearings are necessary to interpret complex claims, the trial court must set aside time in its crowded docket for one proceeding to interpret claims and a second (potentially with a jury) to determine infringement and other issues.

2. Claim interpretation, problem I: Fearing that it may not receive the opportunity to supplement expert reports or reopen discovery after the judge's interpretation, a party often argues alternative claim construction theories from the outset of litigation. This extends the time and expense of the claim interpretation proceedings.

3. Bias toward summary judgments: In practical terms, *Markman I* directs the proceedings toward summary judgment on the central issue of the litigation at a potentially premature stage of issue development. Prematurely addressing issues, even at the appellate level, can result in expensive repetition of effort. *See CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1157–58, 1160 n. 7, 42 USPQ2d 1577, 1585, 1587 n. 7 (Fed.Cir.1997) (finding error in a claim construction that had been affirmed in an earlier appeal), *cert. denied*, —— U.S. ——, 118 S.Ct. 1039, —— L.Ed.2d —— (1998).

4. Claim interpretation, problem II: As soon as the trial court issues a claim interpretation, both sides often seek to shift their original claim interpretations to accommodate the judge's views. Thus, the parties seek to revise expert reports or reopen discovery to account for the judge's interpretation. This maneuvering leads to procedural battles over surprise and motions for additional time to prepare for trial. *See Loral Fairchild Corp. v. Victor Co.*, 906 F.Supp. 798 (E.D.N.Y. 1995) (interpreting claims); *Loral Fairchild Corp. v. Victor Co.*, 911 F.Supp. 76, 80–81 (E.D.N.Y. 1996) (preventing plaintiff from changing theory of infringement in response to claim interpretation).

5. The new evidence dilemma: As a result of the new and perhaps somewhat unexpected interpretation, the parties scramble to create and acquire new evidence for their infringement arguments.

6. The learning curve problem: Like all human endeavors, claim interpretation is a learning process. The trial judge makes every effort to state the precise scope of the claims at the close of the initial proceeding, but often, with the additional learning during the infringement trial, realizes that the initial interpretation was too broad or too narrow in some respects. The judge then faces the dilemma of changing the rules in the middle of the game.

7. The judge as a trial issue: With the judge's claim interpretation central to the issues of infringement, trial counsel will try to exploit the judge's stature with the jury to show that the court is on their side.

8. Multiple trials, problem II: In the words of United States District Court Judge Roderick McKelvie: "[I]n spite of a trial judge's ruling on the meaning of disputed words in a claim, should a three-judge panel of the Federal Circuit disagree, the entire case could be remanded for retrial on [a] different [claim interpretation]." *Elf Atochem North Am., Inc. v. Libbey–Owens–Ford Co.*, 894 F.Supp. 844, 857, 37 USPQ2d 1065, 1075 (D.Del.1995).

Trial judges can often address each of the above with careful case management, but at the cost of expending scarce trial court resources.

claim terms? Are trial judges supposed to disguise the real reasons for their interpretation? How will this perverse incentive to "hide the ball" improve appellate review?

As a matter of legal analysis, the *en banc* court's direction to trial judges is equally hard to justify. The objective of claim interpretation is to discern the meaning of the claim terms to one of ordinary skill in the art at the time of invention. *See Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1477, 45 USPQ2d 1429, 1432 (Fed.Cir. 1998) ("It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed."). What then defeats the relevance of the testimony of one of skill in the art at the time of invention? Of course this relevant testimony must not conflict with or attempt to trump contemporaneous intrinsic evidence from the patent document itself, *see Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582–83, 39 USPQ2d 1573, 1576–77 (Fed.Cir.1996), but both trial and appellate judges are poised to halt that abuse. Moreover, by assigning claim interpretation to the judge, *Markman II* has already corrected the major source of the problem with experts, namely their ability to influence lay jurors with the strength of their resumes rather than the strength of their reasoning. In any event, it seems a contradiction to bar those of skill in the art at the time of invention from a search for the meaning of terms to one of skill in the art at the time of the invention. In effect, the *en banc* opinion has *sub silentio* redefined the claim construction inquiry as "how a lawyer or judge would interpret the term."

District courts have already expressed their frustration with the strictures of *Markman I:*

> When two experts testify differently as to the meaning of a technical term, and the court embraces the view of one, the other, or neither while construing a patent claim

as a matter of law, the court *has* engaged in weighing evidence and making credibility determinations.... But when the Federal Circuit Court of Appeals states that the trial court does not do something that the trial court does and must do to perform the judicial function, the court knowingly enters a land of sophistry and fiction.

*Lucas Aerospace, Ltd. v. Unison Indus., LP,* 890 F.Supp. 329, 333–34 n. 7, 36 USPQ2d 1235, 1239 n. 7 (D.Del.1995); *see also Elf Atochem North Am., Inc. v. Libbey–Owens–Ford Co.,* 894 F.Supp. 844, 857, 37 USPQ2d 1065, 1075 (D.Del.1995); *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litigation,* 831 F.Supp. 1354, 1359, 28 USPQ2d 1801, 1805 (N.D.Ill.1993) ("[J]udges should not pretend that all nominally 'legal' issues may be resolved without reference to facts.... What seems clear to a judge may read otherwise to [one skilled in the art].").

## II.

From the patent practitioner's standpoint, this court's enthusiastic assertion of its unfettered review authority has the potential to undercut the benefits of *Markman I. Markman I* potentially promised to supply early certainty about the meaning of a patent claim. This certainty, in turn, would prompt early settlement of many, if not most, patent suits. Once the parties know the meaning of the claims, they can predict with some reliability the likelihood of a favorable judgment, factor in the economics of the infringement, and arrive at a settlement to save the costs of litigation.[3] *Markman I* promised to provide this benefit early in the trial court process. To provide fairness under the *Markman I* regime, trial judges would provide claim interpretations before the expense of trial. Patent practitioners would then be armed with knowledge of the probable out-

---

3. Three variables affect the settlement calculus of each party to litigation: $p$, the probability of the plaintiff obtaining damages; $J$, the expected value of a judgment for the plaintiff; and $c$, the cost of litigation. *See* Richard A. Posner, *The Federal Courts: Challenge and Reform* 89–94 (1996). If $p \times J$ ($pJ$) exceeds $c$, then plaintiff will sue. The plaintiff values the case at $pJ - c$. If the defendant agrees on the values assigned to the variables, the suit will cost him $pJ + c$. This rough model poses an interesting question. Because the costs of litigation invariably exceed the costs of settlement, why do not all cases settle? Chief Judge Posner answers: "[U]ncertainty as to outcome is the key to the settlement rate...." *Id.* at 90. This uncertainty leads each party to overestimate its chance of prevailing. Accordingly, each party will assign different values to the variables, most notably $p$, thereby diminishing the likelihood of settlement.

come of the litigation and could facilitate settlement.

The problem with this plan was in its implementation because as a question of law, claim interpretation is subject to free review by the appellate court. The Federal Circuit, according to its own official 1997 statistics, reversed in whole or in part 53% of the cases from district courts (27% fully reversed; 26% reversed-in-part). Granted this figure deals with all issues in cases with many issues. Nonetheless, one study shows that the plenary standard of review has produced reversal, in whole or in part, of almost 40% of all claim constructions since *Markman I*.[4] A reversal rate in this range reverses more than the work of numerous trial courts; it also reverses the benefits of *Markman I*. In fact, this reversal rate, hovering near 50%, is the worst possible. Even a rate that was much higher would provide greater certainty.

Instead, the current *Markman I* regime means that the trial court's early claim interpretation provides no early certainty at all, but only opens the bidding. The meaning of a claim is not certain (and the parties are not prepared to settle) until nearly the last step in the process—decision by the Court of Appeals for the Federal Circuit. To get a certain claim interpretation, parties must go past the district court's *Markman I* proceeding, past the entirety of discovery, past the entire trial on the merits, past post trial motions, past briefing and argument to the Federal Circuit—indeed past every step in the entire course of federal litigation, except Supreme Court review. In implementation, a *de novo* review of claim interpretations has postponed the point of certainty to the end of the litigation process, at which point, of course, every outcome is certain anyway.

In practical terms, this implementation record has other perverse effects. Trial attorneys must devote much of their trial strategy to positioning themselves for the "endgame"—claim construction on appeal. As

the focus shifts from litigating for the correct claim construction to preserving ways to compel reversal on appeal, the uncertainty, cost, and duration of patent litigation only increase. Thus, the *en banc* court's *de novo* regime belies the purpose and promise of *Markman I*.

Several high profile appeals have illustrated the problem created by the Federal Circuit's high reversal rate. In *Lubrizol*, 64 F.3d 1553, and *J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 41 USPQ2d 1641 (Fed.Cir.1997), this appellate court rejected not only the trial judge's claim reading, but also the readings advocated by both parties at trial and the readings advocated by all experts in the trial. In fact, in *Eaton*, the Federal Circuit did not base its interpretation on the specification or the totality of the prosecution history, but instead found its meaning in a brief excerpt from the affidavit of a single expert witness at the end of a lengthy prosecution. *See* 106 F.3d at 1568, 1570. If the parties might succeed in convincing the Federal Circuit to reverse an entire trial result with an argument never presented to the trial court or with a brief excerpt from hundreds of pages of prosecution (again not presented to the trial court), would they be wise to settle after a trial court's reading of the claims?

One other case makes the point even more persuasively. In *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 42 USPQ2d 1577 (Fed.Cir.1997) (*Tura*), the Federal Circuit reversed its own earlier claim interpretation as a question of law when the defendant and stage of the proceedings changed. On a motion for a preliminary injunction in an infringement action, a Maryland district court interpreted the 3% elasticity limitation in a claim for flexible eyeglass frames. On appeal the Federal Circuit reviewed this claim interpretation as a question of law and affirmed in a nonprecedential opinion. *See*

---

4. This figure is based on a survey of every patent decision rendered by the Court of Appeals for the Federal Circuit between 5 April 1995 (the date *Markman I* was decided) and 24 November 1997. A total of 246 patent cases, originating in the Board of Patent Appeals and Interferences (BPAI), the district courts, and the Court of Federal Claims, were evaluated. Of the 246 cases,

141 cases expressly reviewed claim construction issues. Among these 141 decisions, this court reversed, in whole or in part, 54 or 38.3% of all claim constructions. With respect to the district court and Court of Federal Claims cases, the rate of reversal of claim constructions is 47 out of 126 or 37.3%.

*CVI/Beta Ventures, Inc. v. Custom Optical Frames, Inc.,* 1996 WL 338388 (Fed.Cir.1996) (nonprecedential); *see also Tura,* 112 F.3d at 1160 n. 7. Understanding that the law must not change from case to case or from circumstance to circumstance, a New York district court applied the Federal Circuit's claim interpretation in a separate infringement action involving the same patent. After trial, the defendant appealed. This time the Federal Circuit reversed the district court's claim interpretation. *See Tura,* 112 F.3d at 1149 ("We conclude that the district court did err in *its* claim construction.") (emphasis added). Although this court referred to the New York district court's "error," the Federal Circuit had in fact reversed itself.

One potential trial court response to the *CVI/Beta* problem might be the issuance of "tentative" claim constructions as a matter of law. *See International Communication Materials, Inc. v. Ricoh Co., Ltd.,* 108 F.3d 316, 41 USPQ2d 1957 (Fed.Cir.1997). This response, of course, would further frustrate the parties' desire to receive a certain claim construction as early as possible.

Regardless, if the Federal Circuit's reading of the very same claim can vary from one appeal to the next, every patent litigant has an incentive to appeal every action to the Federal Circuit in hopes that the statistics will hold up and eventually the appellate court will reverse. Even the Federal Circuit's claim interpretations as questions of law are not certain. Is this the "uniformity" outlined by the Supreme Court in *Markman II?*

### III.

Because patent trial practitioners understand the distinct prospect of overturning trial court results on appeal, the trial arena loses some of its luster as the center stage of the dispute resolution drama. Instead the trial court becomes a ticket to the real center stage, the Court of Appeals for the Federal Circuit. Taking a cue from the Supreme Court, this court would more wisely take a functional approach to setting a standard of review for claim construction.

In *Markman II,* the Supreme Court noted that neither history nor precedent provided "clear answers" about the role of the jury and the factual or legal nature of claim construction. 517 U.S. at 388–90, 116 S.Ct. at 1395. Therefore, the Court pursued a functional inquiry to determine whether the judge or jury could best balance the complexities of claim construction. *See id.* A similar functional inquiry might best clarify the roles of the trial and appellate benches during claim interpretation.

The Supreme Court has provided some guidelines for such a functional approach. The Court counsels appellate courts to defer "when it appears that the district court is 'better positioned' than the appellate court to decide the issue in question or that probing appellate scrutiny will not contribute to the clarity of legal doctrine." *Salve Regina College v. Russell,* 499 U.S. 225, 233, 111 S.Ct. 1217, 1222, 113 L.Ed.2d 190 (1991). At another point, the Court cautions: "[T]he reviewing attitude that a court of appeals takes toward a district court decision should depend upon 'the respective institutional advantages of trial and appellate courts.'" *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 948, 115 S.Ct. 1920, 1926, 131 L.Ed.2d 985 (1995) (quoting *Salve Regina,* 499 U.S. at 233, 111 S.Ct. at 1222).

Applying this general counsel, the trial judge enjoys a potentially superior position to engage in claim interpretation. For the complex case where the claim language and specification do not summarily dispose of claim construction issues, the trial court has tools to acquire and evaluate evidence that this court lacks. Trial judges can spend hundreds of hours reading and rereading all kinds of source material, receiving tutorials on technology from leading scientists, formally questioning technical experts and testing their understanding against that of various experts, examining on site the operation of the principles of the claimed invention, and deliberating over the meaning of the claim language. If district judges are not satisfied with the proofs proffered by the parties, they are not bound to a prepared record but may compel additional presentations or even employ their own court-appointed expert.

An appellate court has none of these advantages. It cannot depart from the record of the trial proceedings. To properly marshal its resources, the appellate bench must

enforce strict time and page limits in oral and written presentations.[5] Moreover a sterile written record can never convey all the nuances and intangibles of the decisional process. Indeed a careful consideration of the institutional advantages of the district court would counsel deference. This court's categorical response that claim interpretation involves no factual assessments does not advance a functional analysis of trial and appellate roles in claim construction. As a matter of fact (so to speak), claim construction requires assessment of custom and usage in the relevant art, assessment of events during prosecution, assessment of the level of ordinary skill in the art, assessment of the understanding of skilled artisans at the time of invention—to name just a few factual components of the complex process of claim interpretation. A careful functional analysis counsels deference for district court claim interpretations.

## IV.

The Supreme Court may have offered a path out of this predicament. At least three times in *Markman II*, as noted earlier, the Court alluded to the factual component of claim interpretation. At no point did *Markman II* address the appropriate standard of review. Nonetheless this court misses the opportunity to improve certainty in patent practice by giving appropriate deference to trial court claim interpretations, particularly in complex cases. If this court accords more deference to trial court interpretations in the complex cases, soon the district courts will provide the desired certainty early in the process. At that point, *Markman I* will fulfill its promise. Administration of patent law will move toward less costly disputes and earlier settlements.

*Markman I* set out to improve patent law administration by removing uncertainties from the dispute resolution process (the chief uncertainty, of course, being jury results). Inadvertently the reasoning in *Markman I* has postponed the point of certainty to the extreme end of the judicial process. This delay both disrupts the orderliness of trials and practitioners' hopes for more efficient and earlier claim constructions. The Supreme Court removed the jury uncertainty with its decision and, by recognizing a factual component in claim interpretation, provided a way for this court to accomplish much of its early goals. By according some deference where appropriate, this court can restore the trial court's prominence in the claim interpretation function and bring again more certainty at an earlier stage of the judicial process. Applying the Supreme Court's reasoning for habeas proceedings to claim construction, "adoption of [a rule of appropriate deference] ... will have the salutary effect of making the [district court's] trial on the merits the 'main event,' so to speak, rather than a 'tryout on the road' for what will later be the determinative [appeal to the Federal Circuit]." *Wainwright v. Sykes,* 433 U.S. at 90, 97 S.Ct. at 2508. This certainty, in turn, would stimulate more settlements and efficient decision making—the promise of *Markman I*. With this reasoning in mind, I respectfully dissent from the claim interpretation pronouncements of the *en banc* opinion, concur in the judgment, and join only part IV of the *en banc* opinion.

PAULINE NEWMAN, Circuit Judge, with whom Chief Judge MAYER joins; additional views.

As this case illustrates, perfection is elusive in the aftermath of the Federal Circuit's decision in *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 34 USPQ2d 1321 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461 (1996). The expectation of greater stability in the application of patent law—thus enhancing consistency in result, reducing the cost of litigation, and indeed reducing litigation by diminishing the uncertainties of jury trials—has not been well achieved.

---

**5.** These necessary strictures contribute to the Federal Circuit's perception of claim construction. Pressured by these necessary rules, parties before the Federal Circuit strive mightily to reduce their cases to a few issues controlled by a few passages from the specification or the prosecution history. For these reasons, the appeal process does not present a fair picture of the complex task of untangling the knot of legal and factual issues presented for trial. A seemingly simple issue of claim construction on appeal takes on an entirely different complexion in its proper context as one tiny facet of a massive corpus of litigation.

Most of the shortfalls between expectation and reality arise from the manner of implementation of our de novo authority for claim interpretation. I cite three principal areas. The first area relates to the treatment of certified questions. Although the district courts have extended themselves, and so-called *"Markman* hearings" are common, this has not been accompanied by interlocutory review of the trial judge's claim interpretation. The Federal Circuit has thus far declined all such certified questions. Indeed, the certified question issue was an early warning of the difficulties that could flow from premature claim interpretation, for it was often apparent from the petition that the claims could not be finally and correctly interpreted without evidence beyond the patent documents. The absence of extrinsic evidence, of resolution of conflicting positions, and of detailed analysis and findings by the trial judge, inhibited claim interpretation by certified question. Thus, instead of conducting the expected dispositive de novo review, we simply declined the question. The possibility of early finality to claim interpretation has not materialized, with two untoward consequences; first, the district court has had to conduct a perhaps unnecessary trial; and second, the eventual issuance of a new claim interpretation by the Federal Circuit, on appeal after final judgment, has sometimes required a second trial of the issue of infringement. None of these consequences comports with our insistence that claim interpretation is purely a matter of law, that it needs no findings at trial, and that it will be decided de novo by the Federal Circuit.

The second area of disappointed expectations has flowed from the unexpectedly creative de novo claim interpretations that the Federal Circuit has issued in a few cases. This unpredictability in administration of the law of patent claiming has added a sporting element to our bench. It has not only released appellants' imaginations on appeal, but it will surely add complexity to future trials, as lawyers attempt to guard against the judicial imagination.

A third concern, although rare in occurrence, is of great significance, for even one case wherein the Federal Circuit has deemed itself unconstrained by its own prior interpretation of the same patent removes finality and encourages relitigation of every patent. The promise of uniformity and finality, flowing from decisions of national effect, is a failed promise if we are not bound by stare decisis in our own claim interpretation.

These flaws are of serious concern, no less because they are of our own making. They are not irremediable, although remedy may require a larger vision than we possess. However, today's en banc opinion adds another encumbrance to the procedures for interpretation of claims, further inhibiting fruition of the *Markman* expectation. When the issues in litigation involve complex questions of science and technology, a special effort is required of the judicial process.[1] In litigation of patent disputes the nature of the evidence that is received and considered, the balance between the trial and appellate functions, and the evidentiary rules governing opinion testimony and experts, are of particular importance. Today's decision falls short in each of these areas.

Procedural and evidentiary rules should weigh toward facilitating judicial understanding of the issues and thereby reaching the correct result. Yet the Federal Circuit rules today that it will not consider factual findings of the trial court, expressly disavowing such actions by prior panels. The court continues to deny the need to make findings of disputed facts when interpreting claims: "[By] using certain extrinsic evidence that the court finds helpful and rejecting other evidence as unhelpful, and resolving disputes *en route* to pronouncing the meaning of claim language ... the court is *not* crediting certain evidence over other evidence or making factual evidentiary findings." *Maj. Op.* at 1454 (quoting *Markman*, 52 F.3d at 981, 34 USPQ2d at 1331). The court states that it neither accepts the trial judge's findings of fact, nor accepts that there are factual issues

1. In 1993 the Carnegie Commission on Science, Technology, and Government wrote:

The courts' ability to handle complex science-rich cases has recently been called into ques-

tion, with widespread allegations that the judicial system is increasingly unable to manage and adjudicate science and technology issues. Report, March 1993, p. 11.

in claim interpretation. With these strictures on evidence, witnesses, and findings, it is far from clear how the Federal Circuit proposes to reach the correct claim interpretation.

By continuing the fiction that there are no facts to be found in claim interpretation, we confound rather than ease the litigation process. Without doubt, factual disputes arise and must be resolved in order to interpret the claims. Such facts are normally resolved at trial—yet we now deny ourselves the opportunity even to consider the findings of the trial court. *See maj. op.* at 1456 (disavowing the procedure in a Federal Circuit opinion whereby the court recognized the trial court's " 'trained ability to evaluate [expert] testimony in relation to the overall structure of the patent' and the trial court's 'better position to ascertain whether an expert's proposed definition fully comports with the specification and claims' "). The court today not only rejects the opportunity to give normal appellate deference to the proceedings and findings of trial, but also rejects the opportunity to consider them at all.

In *Markman* the en banc court took the position that in patent cases, unlike any other area of law, a disputed question of the meaning, scope, and usage of terms of technologic art is not a question of fact, or even of law based on underlying fact, but is pure law. However, the Supreme Court has relieved us of adherence to this fiction, by its recognition of the factual component of claim interpretation. Further, the Court's affirmation that claim interpretation "is exclusively within the province of the court," 517 U.S. at 371–73, 116 S.Ct. at 1387, 38 USPQ2d at 1463, did not shut out the trial judge along with the jury. In declining to affirm the Federal Circuit's fact/law theory, the Court opened the door for retreat from this artificial construct. I urge us to do so, for experience shows that unforeseen and undesired consequences are flowing from its rigidity. Now that this fact/law rigor is no longer necessary for constitutional combat, let us review these consequences and accept this invitation to advance our procedures.

For example, in *Markman* the Federal Circuit stated that it is not a finding when one side's evidence is accepted and the other side's evidence is rejected. 52 F.3d at 981, 34 USPQ2d at 1331. Since accepting one side's evidence and rejecting the other's based on an assessment of validity would be a finding, some other criterion must be the basis for the choice. The court has never stated what this criterion could be, except that accepted evidence should be "helpful," an answer that begs the question.

A fresh view of fact and law would also ameliorate the constraints we have placed on the presentation of extrinsic evidence on the issue of claim interpretation. Patent litigation now often starts with a preliminary hearing to interpret the disputed claim terms, and often produces an early summary judgment, a path perhaps fostered by our foreclosure of the certified question. This preliminary ruling can be dispositive of the dispute, for the scope of the claim often decides whether there can be literal infringement. Thus I add to my concerns the position of the Federal Circuit, here reaffirmed, that extrinsic evidence is of strictly limited availability in claim interpretation. Such evidence should be encouraged, not restrained, if summary disposition is at hand.

The value of extrinsic evidence in claim interpretation is not surprising, because patent documents are written by and for persons in the field of the invention, not for judges. Judges not only need a larger understanding of the science or technology, but we also need help with understanding how the particular terms as used in the patent are viewed by persons in the field of the invention. As Judge Schwarzer observed:

> The context in which [issues of science and technology] arise varies widely, but generally they share one characteristic. They challenge the ability of judges and juries to comprehend the issues—and the evidence—and to deal with them in informed and effective ways. As a result, they tend to complicate the litigation, increase expense and delay, and jeopardize the quality of judicial and jury decision making.

Federal Judicial Center, *Reference Manual on Scientific Evidence* 1 (1994). The Federal Circuit's ruling that extrinsic evidence must be restricted unless there is a facial ambiguity in the meaning of the claim is an unnecessary restraint on potentially useful evidence. *See Daubert v. Merrell Dow Phar-*

maceuticals, Inc., 509 U.S. 579, 588, 113 S.Ct. 2786, 2794, 125 L.Ed.2d 469 (1993) (" 'If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert ... may testify thereto in the form of an opinion or otherwise.' ") (quoting Fed.R.Evid. 702).

Of course the primary source of information concerning the claimed invention is the patent documents. But such documents are directed to persons knowledgeable in the field; additional evidence and expert testimony as to their meaning should be the rule, not the exception. So-called "extrinsic" evidence—the evidence of expert witnesses and of experimentation, exhibits, demonstrations, and explanation—should be treated like any other evidence, and received and given weight and value as appropriate. Our broad constraint on resort to such evidence is an unnecessary bar to enlightenment. It is also an incursion into the authority of the trial court. See General Electric Co. v. Joiner, — U.S. —, —, 118 S.Ct. 512, 515, 139 L.Ed.2d 508 (1997) (decision of trial court to admit or exclude expert testimony is reviewed on abuse of discretion standard).

The real issue with respect to such evidence is not the threshold question of admissibility, as this court appears to hold, but of weight, upon examination of the evidence and in conjunction with the other evidence. These too are matters for the trial judge, and when the threshold criteria of relevance and reliability are met, see Daubert, the evidence should be received and considered as appropriate to its credibility and weight. It follows that the trial court's factual findings with respect to evidence relevant to claim interpretation should be treated, on appeal, like any other finding of the trial court.

Thus it is quite discouraging to observe this en banc ruling wherein the Federal Circuit prohibits itself from considering the findings of fact made by the trial court. The majority opinion disavows this court's prior statement that "[t]he district court's findings of scientific/technological fact were material to the issue of construction of the term."

This disavowal deprives the court, and the parties, of the accumulated progress and experience of the trial, including the findings of the trial judge, and leaves us on appeal with an expurgated record and generally inferior basis of decision. Recognizing that our appellate role is to decide whether the claims were correctly interpreted in light of all of the evidence, it is mysterious why we choose to self-censor what we will consider on appeal. It is equally obscure why this court would prohibit itself from relying on a trial court's findings, or from choosing between disputed expert positions. I strongly disagree with the majority's view of the role of extrinsic evidence, at trial and as considered on appeal.

In contrast, a return to the traditional trial/appellate relationship would achieve several important results. It would rationalize the admissibility of relevant extrinsic evidence, appellate deference would be restored instead of disavowed, and appellate review would be in accordance with the rules. The processes of both trial and appeal would benefit. This is particularly important because the evidence involved in claim interpretation, whether intrinsic or extrinsic, is often scientific or technologic. The evidence of what the invention is, how it works, what the technical words meant to persons in the field at some past time, can be of extreme complexity. When there is a dispute as to what a term of technical art or usage means or encompasses, such evidence is relevant and often is indispensable. Why would our court foreclose, or place obstacles in the path of, adducing and considering such evidence?

Surely the better view is to encourage judicial access to scientific evidence and findings based thereon. The ultimate beneficiary would be the parties, for the courts would be less restricted in the search for the correct and just result in patent cases. Thus I must, respectfully, dissent from the court's rulings on these issues.